**SECOND DIVISION**
**BARNES, P. J.,**
**RICKMAN and SELF, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 8, 2017**

# In the Court of Appeals of Georgia

A16A1768. IN THE INTEREST OF E. G. M., a child.

A16A2045. IN THE INTEREST OF I. L. M. et al., children.

SELF, Judge.

In July 2015, the Juvenile Court of Cherokee County terminated a mother and father's parental rights to their three minor children[1] – I. L. M. (date of birth April 9, 2008), I. T. M. (date of birth July 14, 2010), and B. M. (date of birth June 8, 2013).[2] Three months later, the mother gave birth to the couple's fourth child, E. G. M. (date

---

[1] See OCGA §§ 15-11-310, 15-11-311, 15-11-320 (statutes governing termination of parental rights).

[2] Although the juvenile court conducted the termination of rights hearing in July 2015, its order was not filed until October 6, 2015, "nunc pro tunc for July 15, 2015, and July 17, 2015."

of birth October 4, 2015). Following a January 2016 adjudication hearing,[3] the juvenile court found E. G. M. to be a dependent child in an order filed February 11, 2016,[4] and placed temporary custody of E. G. M. with the Cherokee County Department of Family and Children Services ("DFCS"). The juvenile court denied the parents' motions for new trial in both cases, and the parents appeal. In Case No. A16A2045,[5] the parents contend that their parental rights to I. L. M., I. T. M., and B. M. should not have been terminated because they substantially completed their case plan such that the children's dependency "was not likely to continue or cause future harm" and because termination was not in the children's best interests. In Case No. A16A1768,[6] the parents argue that the juvenile court impermissibly continued E. G.

---

[3] See OCGA § 15-11-181 (a).

[4] See OCGA § 15-11-2 (22) (A). We note that the new Juvenile Code applies to these proceedings because the termination petition was filed in January 2015, after the new Code went into effect. See *In the Interest of J. A. B.*, 336 Ga. App. 367 (785 SE2d 43) (2016). In addition, the "new Juvenile Code uses the term 'dependent' instead of 'deprived'[,] [but] [t]he distinction does not alter our analysis here." Id. at 368, n. 2.

[5] We granted the parents' application for discretionary appeal of the termination order. See OCGA § 5-6-35 (a) (12).

[6] In contrast, dependency orders are directly appealable. See *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997).

M.'s adjudication hearing for over three months without good cause and erroneously concluded that DFCS presented clear and convincing evidence of dependency. We have consolidated these related cases for purposes of appeal and, finding no error, we affirm the juvenile court's orders in both cases.

1. In an appeal from either a termination of parental rights or an adjudication of dependency, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that a parent's rights should have been terminated or that a child is dependent, respectively. See *In the Interest of J. A. B.*, 336 Ga. App. 367, 368 (785 SE2d 43) (2016) (standard of review in termination case); *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 (784 SE2d 83) (2016) (standard of review in dependency case). In making these determinations,

> we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened. [Cit.]

*S. C. S.*, 336 Ga. App. at 245.

3

So viewed, the evidence revealed that the parents' history with DFCS began in August 2012, when then two-year-old I. T. M. roamed from the parents' home while the mother was asleep; at the time, the father was not home. Law enforcement found I. T. M. wandering a busy street approximately two hours later. Once I. T. M. was identified and his home located, DFCS assessed the condition of the parents' home and determined that it was not adequate. As a result, DFCS removed I. L. M. and I. T. M. from the parents' home[7] and, in November 2012, placed custody of I. L. M. and I. T. M. with foster parents.[8] After I. L. M. and I. T. M.'s removal, the mother became pregnant with B. M. and, following his June 2013 birth and a subsequent positive drug screen by the mother, B. M. joined his siblings with the foster parents in December 2013.[9] Of note, B. M. was born addicted to methadone and experienced some withdrawal symptoms as a result.

---

[7] The juvenile court adjudicated I. L. M. and I. T. M. deprived based upon neglect and lack of supervision, and that order was not appealed.

[8] The father and the foster father are first cousins.

[9] The juvenile court adjudicated B. M. dependent based upon neglect, failure to provide adequate support due to unstable employment, substance abuse, the father's unresolved criminal history, and the family history of DFCS involvement. The parents did not appeal the juvenile court's order of deprivation.

4

(a) *The parents' background, employment and living arrangements*. At the time of the July 2015 termination hearing, the mother and father lived with the father's parents and had never lived independently of the father's parents. Although the mother and father gave the father's parents $50 to $100 per week, the father's parents also helped the mother and father financially. Both the father and the mother left high school before graduating and neither had obtained a GED.

The mother had been working at a local gas station for four weeks after having been fired from Wal-Mart in March or April 2015. The mother also had prior, brief employment stints with Subway, Taco Bell, and an unknown automotive parts company. At the gas station, the mother worked four days a week and earned approximately $300 per week. At the time of the hearing, the father had most recently worked "a few weeks ago" at a poultry processing facility earning approximately $350 per week. Prior to that, he had employment of varying lengths, not exceeding two months, at a hatchery sanitation company, Subway, and Dairy Queen. In addition, the father stated that he did odd jobs, including tree cutting and mowing lawns, and that he and his father sold firewood every year. Between 2004 and 2006, the father reported having employment at various construction-related companies lasting from approximately seven months to over a year. On their 2014 tax returns, which

contained the couple's most recent annual income information, the mother and father reported a joint income of approximately $5,900. The father reported the couple's biggest expenses as "gas [and] cigarettes. . . ."

(b) *The parents' substance abuse.* The mother had prescriptions for methadone and at least two antidepressants. The mother previously received methadone treatment from the Cartersville Treatment Center, followed by treatment from the Woodstock Treatment Center "for maybe two years." After the 2010 birth of I. T. M., the mother also secured prescriptions for Lortab, a pain medication, and admitted to an addiction to pain medication. The mother's initial dosage of methadone was 45 milligrams, but that had increased to 135 milligrams at the time of the hearing. She visited the treatment center weekly for a new bottle of methadone and did not think she was ready to wean herself from the methadone, although she testified in a 2013 proceeding that she was "trying to wean off of it." Similarly, the mother stated that although she realized she could wean herself off methadone approximately four years prior to the July 2015 hearing, she had not done so. She also stated that she had been taking antidepressant medications for three years. Although the mother was enrolled in substance abuse counseling, she missed several counseling sessions because she stated "it's either keep the job or go to these classes, and I [didn't] know which one

6

to do." In one instance, the mother was discharged from a counseling program as a result of her absences.

The father denied any recent history of substance abuse, but did admit to "dabbl[ing] around in a few things" beginning at 11 or 12 years of age and including almost daily use of marijuana by age 14. He also admitted trying methamphetamine at the age of 13 and using methamphetamine daily from ages 16 to 17, when he was arrested. He claimed to have visited a rehab facility on one occasion and "been in detox one time." Of note, he admitted to an instance of seeking methadone treatment for at least two months as a means of pain relief rather than seeking medical attention. The father reported that he had been diagnosed with anxiety and depression, for which he had been prescribed Alprazolam and Zoloft.

The program director of the parents' methadone treatment facility testified that the mother had been receiving treatment from the facility since October 2012 – almost three years prior to the July 2015 termination of rights hearing. In July 2015, the mother's dosage was 130 milligrams, which the director agreed was typically not "a dosage for someone attempting to wean off of methadone[.]" The director further testified that the mother was regularly screened for drug use and had 12 positive test

results for benzodiazepines[10] from May 2014 to June 2015 despite not having a prescription for benzodiazepines.[11] The director added that the father only received treatment for approximately three and a half months. The father also tested positive for benzodiazepines and methadone, but the director noted that the father had a prescription for a benzodiazepine.

A certified alcohol and drug counselor testified that the parents were scheduled for counseling from August 2014 to December 2014, but that the last counseling for each parent occurred in October 2014. During that time frame, the mother called to cancel the counseling sessions on multiple occasions and the parents failed to appear for counseling at other times. Ultimately, the counselor stopped seeing the parents "until further notice" due to the parents "[n]ot scheduling appointments and not hearing back from them." In 2015, the counseling sessions resumed, although the

---

[10] The director characterized benzodiazepines as a classification of central nervous system depressants, including Xanax and Ativan. She added that methadone is also a central nervous system depressant and that the use of benzodiazepines and methadone in concert can cause "slowing of respiratory function to the point of losing consciousness and death."

[11] Although the mother had been allowed to take home multiple doses of methadone from the facility, the program director stated that the mother would be removed from that portion of the program "effective immediately unless and until she can provide verification of [a valid prescription]" for benzodiazepines.

parents failed to appear on multiple occasions. As a result, the counselor discharged the parents as clients in April 2015, due to their repeated "noshows." Nevertheless, the counselor recommended continued substance abuse counseling for the parents "[t]o help and maintain a recovery lifestyle, to help them with structure, to help them be accountable, work on the lifestyle of recovery and learn to enjoy recovery sober and free."

(c) *The parents' involvement with the children.* In family matters, the mother testified she did not call the children regularly because she could not control her emotions while on the telephone. Although she was aware of I. T. M.'s special needs,[12] she was able to state only that "[h]e's developing . . . slower[,]" that she "hoped that he would grow out of it, but probably not[,]" and that "he needs help." She stated she would take I. T. M. to a doctor for evaluation "and go from there[,]" and claimed that his current therapy was not working. However, she also stated that she had not attended therapy sessions or a surgery at which tubes were inserted into I. T. M.'s ears because she had to work.[13] She further stated that she had never taken

---

[12] For a more detailed discussion of I. T. M.'s special needs, including his diagnosis for autism, see Division 1 (d), infra.

[13] In addition, B. M. had tubes inserted in his ears as well, and the record suggests the parents did not attend B. M.'s surgery.

her children to a dentist and denied that the children's teeth were in severe decay or that I. T. M. had an oral infection. She did report attending marriage counseling and parenting classes. Although she attended citizen review panel meetings and reviewed the goals of her case plan, the mother claimed she "didn't get much out of it. . . ."

Similarly, while the father acknowledged that he and the mother attended "some" of the citizen review panel meetings and that they would "go through what [he and the mother] were supposed to accomplish on [their] case plan and what hadn't been done[,]" the father characterized the meetings as sessions at which he and the mother would be "scolded[.]" He further agreed that the purpose of the meetings was to "go over the goals of [his] case plan" and "to track the progress of [his] case[.]" Similarly, he acknowledged that he and the mother did not complete the "Rejuvenate Hope" program[14] despite having a referral and that he and the mother were discharged from marriage counseling and substance abuse counseling due to excessive absences and funding concerns. In contrast, he reported completing parenting classes and claimed to attend AA and NA meetings. Finally, he stated that he had resolved a prior criminal prosecution by pleading guilty and receiving a sentence of probation.

---

[14] See Division 1 (f), n. 22, infra.

Although the father was aware of I. T. M.'s special needs, he testified that he had not attended I. T. M.'s therapy sessions or the children's surgeries because the child's foster parents never invited him to attend or told him when the events occurred. He also stated that the children's foster parents did not allow him to speak to his children because it was too upsetting to the children.

(d) *Psychological reviews*. A psychologist performed a parental fitness and psychological evaluation of the parents and testified as an expert witness at the termination hearing. Following a review of prior court and medical records, an interview with the mother, and his behavioral observations, the psychologist diagnosed the mother with dysthymia (which the psychologist characterized as "low grade depression that goes on for longer than some of the other depressive disorders"), panic disorder, and opiate dependence. The psychologist opined that these diagnoses, if left untreated, would result in a continuation of the mother's symptoms, including panic attacks, "feeling edgy," irritability, excessive worry, "freez[ing] up[,]" "feeling unmotivated [and] feelings of hopelessness." As a result, the psychologist recommended the mother secure individual therapy to address her anxiety and depression and

11

if she [hasn't] completed the previous evaluation's recommendation of doing the individual or group substance abuse treatment, then that would still [be] recommended because that would help give her the skills to remain free of substances.

And while the psychologist admitted that someone working in retail sales (such as the mother's employment at the gas station) may be attempting to overcome social anxiety, the psychologist also noted that continued substance abuse is a means to "overcome these particular phobias[.]" Finally, although the mother did not reveal her methadone treatment in her evaluation with the psychologist, the psychologist noted that "if she's continuing to use the methadone, it should be monitored." In that regard, the psychologist observed that the purpose of methadone treatment is "to help reduce or eliminate the withdraw[al] symptoms with the eventual goal of getting . . . completely off of it." However, he noted that "oftentimes, it becomes a replacement for the illegal drug and they remain on it for long periods of time."

The psychologist also conducted a parental fitness and psychological evaluation on the father. As he did with the mother, the psychologist interviewed the father and reviewed the father's court and medical records, including his December 2013 chemical dependency assessment, as part of his psychological evaluation. The father elaborated upon his long history with drug use, starting as early as 11 or 12

years old. His drug use included marijuana, alcohol, methamphetamine, and experimentation with a number of additional substances like MDMA, heroin, ecstacy, hallucinogens, and mushrooms. The father also reported substance abuse in his family, including alcohol abuse by his father and methamphetamine abuse by his cousins. The father stated he had been in a three month residential substance abuse program and to "approximately a week of detox treatment. . . ." The psychologist was most concerned with the fact that the father's substance abuse continued even after the father's treatment and criminal charges resulting from substance abuse. In addition, the psychologist noted that the father's chemical dependency evaluation, completed one year prior to the psychologist's evaluation, recommended "weekly group or individual substance abuse treatment. And, to my knowledge, from what [the father] reported to me, he hadn't engaged in any of that treatment."[15]

Ultimately, the psychologist diagnosed the father with generalized anxiety disorder, depressive disorder, and a "provisional diagnosis of amphetamine abuse . . . because he was largely denying issues with that." The psychologist noted that the

---

[15] The psychologist acknowledged that the father had apparently attended "Narcotics Anonymous and Alcohol Anonymous once or twice a week for about seven months[,] [b]ut . . .didn't report having any kind of other substance abuse treatment per se."

father's cognitive scores, including nonverbal, reading, and math skills, were generally "a little bit below average[,]" but added that the scores were not at a level "that would impair his ability . . . to practice good judgment and be able to solve . . . problems." Rather, in the case of the father's math scores, it "just shows that [the father] has some . . . deficits . . . that might impact his ability to help his kids with, say, math homework or balancing checkbooks and dealing with . . . budgets and things like that." However, the psychologist opined that the father's failure to receive substance abuse treatment, coupled with his family history of substance abuse, "increases the likelihood that he's going to have ongoing substance abuse problems."

In addition, the psychologist identified risk factors that would increase the likelihood of parental abuse or neglect, including untreated mental health issues "and that's true for [the father]," substance abuse issues, and interactions with the legal system. The psychologist also noted the history of substance abuse in the mother's immediate family. Finally, after observing that "in psychology, the best predictor of future behavior is past behavior[,]" the psychologist stated that

> it's concerning that the case has been opened for two to three years and
> that he's then separated from his child for that length of time. And -
> because oftentimes, if a parent is able to kind of get their issues in order
> and get everything completed on their case plan, it's usually that it can

14

be . . . done quicker than two or three years. And so since they haven't been able to do that for at least two or three years that it's been opened, that concerns me about him being able to complete it. You know, down the road, being able to follow through with other recommendations[,] [l]ike treatment of the children or any other needs that they may have.

The psychologist also performed a psychological evaluation on I. T. M. Because I. T. M. was largely nonresponsive during the evaluation, the psychologist obtained most information for his review from I. T. M.'s foster mother. The foster mother reported that I. T. M. received special education services and an individual education plan, occupational therapy three days per week, and speech therapy two to three times per week. The foster mother also stated that I. T. M. had "some hearing issues" and that he had significant behavioral problems, including head banging and frequent tantrums. Based on his review, the psychologist diagnosed I. T. M. with pervasive developmental disorder.[16] As a result of the psychologist's cognitive testing, he determined that I. T. M.'s development was "very delayed" and that his language and cognitive abilities were in the "extremely low range, which is . . . in the

---

[16] The psychologist explained that, due to a change in terminology in the psychological community, I. T. M.'s current diagnosis would be autism spectrum disorder.

bottom one percent of kids his age."[17] The psychologist identified neglect as a contributing factor of I. T. M.'s development, but noted that "a lot of [I. T. M.'s] delays are more than what would be accounted for by just neglect." The psychologist recommended that I. T. M. participate in a social skills group, speech therapy, and behavioral therapy, which the psychologist described as "a fairly intensive behavioral treatment program" in which "the parents must be involved . . . to learn the skills that they need to manage these types of serious behaviors." The psychologist characterized involvement by I. T. M.'s parents as "extremely important" in order to practice techniques learned in therapy, consistently keep scheduled appointments for therapy, and strictly monitor the child actions to prevent certain behaviors from "slid[ing][,]" adding that "for [I. T. M.] in particular, it's . . . even more important" because "letting a behavior slide, like him banging his head or something like that . . . could result in significant injury." The psychologist stated that the parents' inability to complete their case plans was concerning because "it would have a negative impact

---

[17] I. T. M.'s occupational therapist testified that I. T. M. originally had "severe developmental delays . . . across, basically all levels or domains of performance including self care, social, emotional, [and] some physical delays, too. . . ." However, she added that he has made "some good gains[,]" including the ability to manage the Velcro on his shoes, to put on and take off pants, draw horizontal and vertical lines, respond to his name, and a reduction in the frequency and severity of self-harming behavior and tantrums.

on [I. T. M.] if those things were not followed through[,]" to the point that I. T. M. could regress.[18]

Noting that I. L. M. was seven years old, I. T. M. was five years old, and B. M. was two years old, the psychologist characterized these stages of early development as "critical to their development of self and security [and] attachment. . . ." Of particular note, the psychologist stated that, at their ages and having been in foster care for approximately two and a half years and assuming that the children bonded with their foster parents, "there's a high potential that [the children] will experience regression or behavioral problems in the future" if they are removed from their foster parents.[19] He added that breaking a child's attachment to a caregiver "places [the child] at greater risk of emotional problems down the road[,]" including "increased risk of substance abuse, emotional and behavioral problems, [and] delinquency." He

---

[18] I. T. M.'s occupational therapist agreed that I. T. M. could regress if he did not have a stable and consistent home environment.

[19] In fact, I. T. M.'s occupational therapist noted that I. T. M.'s foster parents had been supportive, very receptive to the therapist's instructions, and had been "actively involved with [I. T. M.'s] treatment[.]" The therapist also stated that I. T. M. appeared attached or bonded to his foster parents. The therapist similarly indicated that I. T. M. needs a "a home environment that's stable, consistent, loving, [and] that . . . is nurturing and attentive to, and able to meet his needs[,]" and that removing him from his foster parents "could have a negative impact."

also agreed that it was "very helpful" for parents whose children had been removed from the home and placed in foster care to "maintain bonds with their children through frequent contact or visitation or telephone contact" and that the absence of such contact could be "detrimental to the child[.]" Similarly, the psychologist testified that it is "very important for individuals to . . . maintain their sobriety especially if they have a history of drug related problems because it impairs your ability to function. . . ." In short, if parents have not addressed the risk factors the psychologist identified, the psychologist agreed that it would not be in the children's best interests to return them to their parents because "that could place the children in high potential of harm or risk in the future."

(e) *The children's placement in foster care.* The children's foster mother testified that visitation by the parents was sporadic. She revealed that

> [t]here would be phases of times where they would not show up as often, call and say they're coming and not come. Then there would be a period of time where they didn't come at all. And just recently, they have been coming more.

The foster mother testified that the father had missed visitation 58 times and the mother had missed 45 visitations. She further testified that the father had been on time only nine times, while the mother had been on time 24 times. On most occasions

18

when the parents did not appear for visitation, the parents did not call. Finally, she stated that the parents typically leave up to an hour early. The foster mother also stated that the parents' last telephone contact with the children was in December 2014, and that the parents had not attempted to contact the children by telephone to speak with them since then. Similarly, the parents had not attempted to call on the children's most recent birthdays, and the foster mother reported that it was difficult to contact the parents by telephone. Often, the children's paternal grandparents, rather than the parents themselves, telephoned the foster parents to inquire about the children.[20] And at the time of the hearing, I. T. M. and B. M. had recently had ear surgeries; although the parents were notified of the surgeries and reported they would call to obtain further details, they neither called nor attended the surgeries.[21] Likewise, although the parents had been invited, they had not attended any of I. T. M.'s therapy sessions. Nor had the parents had contact with the children at the children's school. When the parents did visit their children, the foster mother

[20] For their part, the parents alleged they had been told by the foster parents not to call the children because the calls upset the children; the foster mother denied the parents' claim, but believed that the parents, rather than the paternal grandparents, needed to call and speak with the children.

[21] The foster father described the surgery as inserting tubes into the children's ears to relieve fluid build up in their ears. Apparently, the surgeries were successful.

19

described their interactions as "more of an aunt/uncle relationship" and "not like a mother/dad type bond[,]" adding that the children "don't run up and say, 'Mommy,' and . . . love on them during the visitation and hold them, and cry when they leave."

After being placed with the foster parents, I. T. M. made several improvements. For example, he was able to turn on light switches, jump up and down, kick a ball, stack blocks, thread beads, look his foster parents in the eye, and say short sentences – none of which he had been able to do upon placement with the foster parents. In addition, I. T. M.'s self-harming behavior had "gotten much better." The foster father also noted that I. L. M. urinated in his bed when he was first placed with the foster parents, but that the behavior had gotten better; however, I. L. M. had issues with wetting his bed after visitations as recently as April 2015.

Finally, the foster mother expressed hope that the parents would ultimately be able to regain custody of their children, but also noted that she would be concerned if the children were returned to the parents at the time of the hearing due to the parents' lack of stable employment, lack of transportation, lack of a telephone, and the paternal grandmother's health. The foster mother also described a visitation during which the mother's eyes appeared heavy and the mother "drool[ed] as she was

20

talking to [the foster mother]. . . ." She stated that she was willing to adopt I. L. M., I. T. M. and B. M. in the event the parents' rights were terminated.[22]

(f) *DFCS case management.* Two DFCS case managers also testified. The initial case manager, Cash, testified that DFCS's contact with the parents was inconsistent because the only working telephone number was the paternal grandfather's mobile telephone. On numerous occasions, Cash met with the parents to review their case plan. In addition, DFCS made several referrals to allow the parents to complete the items listed in their case plan, including parenting classes and substance abuse counseling. However, during Cash's time as the initial case manager, the parents did not complete their case plan. For example, the parents failed to provide evidence of stable employment. The parents also did not participate in the "Rejuvenate Hope" program[23] due to their failure to contact the service provider.

---

[22] In addition, the foster parents had three additional children in their home, whose parents were second cousins of the foster father. The foster mother stated that she and her husband were in the process of adopting those children as well.

[23] Cash specifically identified the parents as candidates to whom the program would be helpful. The program would have provided a personal mentor for the parents and "would also address substance abuse issues as well as lifelong skills that parents would need in order to sustain themselves in being able to parent their children." For additional discussion of the parents' notice of the "Rejuvenate Hope" program, see Division 3, infra.

Finally, although the parents visited with their children, they did not do so consistently and frequently missed, or were late for, scheduled visitation. Likewise, the parents failed to maintain consistent contact or cooperate with DFCS, including "showing any effort on their own that they were cooperating both with [DFCS], or the services that [DFCS] provided or was providing. . . ." Cash did note that the parents' home, which they shared with the paternal grandparents, had been reassessed and deemed appropriate.

Cash identified the parents' biggest challenges as maintaining consistency, substance abuse, and "taking part actively and being engaged into something that would benefit them." In addition, the parents continued to deny any substance abuse issues.[24] In fact, Cash believed that the parents' substance abuse issues formed the underlying reason for their inability to maintain consistency in employment. Cash identified instances of a lack of parental care and control, primarily including neglect of the children's medical issues, and opined that the lack of parental care and control was likely to continue. And although the parents stated they wanted their children back, Cash noted the parents' lack of

---

[24] The mother also denied substance abuse during the July 2015 termination of rights hearing.

consistency that they've demonstrated as far as following through with completing things timely for themselves. And I look at it through the angle that if they're not completing those things timely, then are they going to complete the things timely that their children need, and if they're going to follow through with either medical and educational. He also noted their lack of urgency in taking steps leading to their children's return. In sum, Cash believed that I. L. M. and I. T. M. were "severely neglected" at the time of their placement and that they had "continued to thrive and make progress" with their foster parents. Cash further believed that termination of parental rights was in the children's best interest.

However, Cash acknowledged that a case plan had not been filed with the juvenile court. He also stated, in contrast to his prior direct testimony that the parents did not submit consistently to random drug testing, that the parents only missed one random drug test. Similarly, Cash agreed that certain entries in DFCS records concerning the parents' continued substance abuse were inaccurate. He further acknowledged that the mother sought out parent counseling and that her behavior during visitations had been appropriate. Cash also confirmed that the parents' housing was not an issue and that, at least in October 2012, the children were bonded to their parents. Finally, Cash agreed that DFCS erred in failing to provide the children with certain services due to budgetary restrictions and staff shortages; that visitation

23

supervised by a third party had been recommended, but not implemented, during his tenure; and that DFCS had made no referral to address the parents' mental health.

The case manager at the time of the termination hearing, Woodward, testified that she was assigned the parents' case in November 2014, but was unable to establish contact with the parents until January 2015. Thereafter, Woodward's contact with the parents varied. For example, when it became necessary to secure the parents' consent for I. T. M. and B. M.'s surgeries, the parents did not appear for a meeting scheduled to execute the consent forms. Similarly, Woodward expressed concern over the parents' truthfulness, including the mother's false statement that she was working at Wal-Mart when, in fact, her employment had ended. Of note, the parents had not completed several items in their case plan, including substance abuse counseling. During meetings with the parents, however, Woodward discussed the parents' prescriptions, I. T. M.'s diagnoses, and the need to maintain contact with the case manager. Of particular relevance, Woodward also discussed the parents' case plan with them, including the goals of the plan and the need for substance abuse counseling.

Woodward's primary concern with the parents was their "lack of urgency in trying to complete the case plan[,]" including their need to attend I. T. M.'s

appointments and to educate themselves about his special needs. To that end, Woodward added that "[c]hildren need to have a permanent home that's consistent, that can meet all their needs, not just some of their needs." She noted that the parents have been unable to demonstrate consistency or stability because "[t]hey don't have a high attendance rate that they can be consistent, or complete their case plan, or just follow[] through with tasks that have been asked of them." Woodward cautioned that a lack of consistency or stability could lead to "severe behavioral changes, emotional problems, [and] attachment issues" in the children. In contrast, she noted that the children were "thriving in their current placement" and that the children were "very attached" to their foster parents, adding that "it's like they belong there." As a result, the case manager opined that termination of the parents' rights was in the children's best interests.

However, Woodward acknowledged that no case plan had been filed with the juvenile court and that she had to "keep resubmitting it" because the plan contained various errors. She further confirmed that the case plan filed with the juvenile court required certain actions, including completion of a parenting seminar, that had already occurred at the time the plan was filed. In addition, she agreed that the "DFCS

25

system said that the case plan was approved according to the panel, even though the panel notes say that there was no case plan[.]"

Woodward stated that the mother's only failed drug test came in December 2013, and that the father had not failed a drug test since November 2014.[25] She also confirmed that, as of the date of the termination hearing, the parents' employment and housing were not issues and that no referral had been made to address the parents' mental health.[26] Likewise, the case manager could not assess whether the children were bonded with their parents.

The children's guardian ad litem reported that the "underlying causes of lack of supervision [and] a lack of cleanliness, were a substance abuse problem" and that the parents "have done nothing to address their substance abuse problems." The guardian highlighted testimony by the parents in which they were unable to identify their triggers for substance abuse or to acknowledge substance addiction and noted that, while both DFCS and the parents "focused on check boxes[,]" neither party "has

---

[25] In addition to drug testing by the parents' methadone treatment facility, DFCS contracted with a vendor to conduct additional testing.

[26] Nevertheless, Woodward testified that she had not received employment verification from the parents and that, under DFCS guidelines, the parents did not have stable employment.

really sat down and focused on what is the problem for these parents and really tried to address it." She also mentioned records from the methadone treatment facility showing that both parents "test positive constantly." Ultimately, the guardian recommended termination of the parents' rights.

*(g) Termination of rights.* In its termination order, the juvenile court thoroughly detailed the parents' ongoing substance abuse issues, citing the psychologist's expert testimony that the mother: (1) suffered from dysthymia, panic disorder, and opiate dependency; (2) "withheld her methadone addiction during [the psychologist's] evaluation" and that "she did not consider herself to have any substance abuse issues"; (3) "must reduce her methadone levels so that she can adequately address her substance abuse issues"; and (4) "is in methadone treatment due to an addiction to pain pills and after four (4) years she has not progressed in her treatment." The juvenile court also referenced additional testimony by the program director of the mother's methadone treatment facility, who confirmed that the mother had been "in methadone treatment for three years . . .with no improvement" and that the mother "has unresolved and chronic substance abuse issues and lacks the ability to meet the needs of [I. L. M., I. T. M., and B. M.]."

27

Similarly, the juvenile court noted the psychologist's testimony that the father: (1) suffered from anxiety, depression, and amphetamine abuse disorder; (2) admitted a "longstanding history of substance abuse of marijuana, alcohol, and methamphetamine" and use of "heroin, cocaine, MDMA, LSD, and hallucinogenic mushrooms"; and (3) "failed to participate in any treatment to address his mental health and substance abuse issues despite receiving a recommendation for substance abuse treatment. . . ." Likewise, the juvenile court cited additional testimony that the father had "taken no meaningful steps to address his chronic substance abuse" and had, in fact, "entered [a] methadone clinic at one time for pain relief to avoid medical care." Finally, the juvenile court found that the parents were discharged from substance abuse treatment due to repeated cancellations of appointments and "no show" appointments.

As a result, the juvenile court determined that there was clear and convincing evidence to terminate the parents' parental rights." The juvenile court concluded that

> [t]here exists parental misconduct or inability relative to the . . . children . . ., in that: (i) [t]he children are dependent children . . .; (ii) [t]he lack of proper parental care and control by the parents is the cause of the children's status as dependent; (iii) [s]uch cause of dependency is likely to continue or will not likely be remedied; and (iv) [t]he continued

28

dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.

In support of its conclusion that the children were dependent, the juvenile court cited the parents' failure "to comply with a previously court ordered plan designed to reunite the family[,]" the parents' "'physical, mental or emotional neglect[,]'" and the parents' "'excessive use of or history of chronic unrehabilitated substance abuse. . . .'" Accordingly, the juvenile court terminated the parents' rights to I. L. M., I. T. M., and B. M. in an order filed October 6, 2015.

*Case No. A16A2045*

2. The parents contend that the juvenile court erroneously terminated their parental rights because there was not clear and convincing evidence: (a) of current dependency; (b) that the causes of dependency were likely to continue; (c) that continued dependency would be harmful to the children; or (d) that termination of the parents' rights was in the children's best interests. We address each in turn.

In considering a termination of parental rights, a juvenile court's two-step analysis begins with OCGA § 15-11-310 (a), which provides that the juvenile court "shall first determine whether one of [several] statutory grounds for termination of parental rights has been met. . . ." One such statutory ground is a determination that

29

[a] child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.

OCGA § 15-11-310 (a) (5). Under the Juvenile Code, a "'[d]ependent child' means a child who . . . [h]as been abused or neglected and is in need of the protection of the court. . . ." OCGA § 15-11-2 (22) (A). "'Neglect' means . . .[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals. . . ." OCGA § 15-11-2 (48) (A). Factors to be considered in determining whether a child is without "proper parental care and control" include:

(2) Excessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent of such child incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his or her child; [and]

(5) Physical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent. . . .

30

OCGA § 15-11-311 (a). Once the juvenile court determines that at least one of the statutory bases for termination is present, the juvenile court must then consider whether termination is in a child's best interests by evaluating a number of factors, including the child's "sense of attachments, including his or her sense of security and familiarity, and the continuity of affection for such child" and the child's "need for permanence, including his or her need for stability and continuity of relationships with a parent, siblings, and other relatives. . . ." OCGA § 15-11-310 (b) (1), (3). "When the court finds that *any* ground set out in Code Section 15-11-310 is proved by clear and convincing evidence and that termination of parental rights is in a child's best interests, it *shall* order the termination of the parent's rights." (Emphasis supplied.) OCGA § 15-11-320 (a).

(a) *Current dependency.* As a threshold matter, the parents did not appeal the juvenile court's deprivation order as to I. L. M. and I. T. M., which found deprivation based upon neglect and lack of supervision. Similarly, the parents did not appeal the juvenile court's order of dependency concerning B. M., which found dependency based upon neglect, failure to provide adequate support due to unstable employment, substance abuse, the father's unresolved criminal history, and the family history of DFCS involvement. As a result, the parents are "bound by [these] finding[s] of

31

deprivation and the first factor is satisfied." *In the Interest of J. P.*, 268 Ga. App. 32, 36 (1) (601 SE2d 409) (2004). Accordingly, we need not revisit those findings here. See *In the Interest of N. T.*, 334 Ga. App. 732, 739-740 (1) (780 SE2d 416) (2015) (citing *In the Interest of I. S.*, 278 Ga. 859, 861, n. 6 (607 SE2d 546) (2005)).

(b) *Causes of dependency likely to continue.* Next, the parents argue that there was insufficient evidence that the causes of the children's dependency were likely to continue in view of their completion of parental counseling, improved housing, intermittent participation in substance abuse counseling, and resolution of the father's criminal proceedings. However, the parents' argument ignores evidence that they have not adequately addressed their substance abuse issues. See OCGA § 15-11-311 (a) (2).

For example, the psychologist testified that the father's chemical dependency evaluation recommended "weekly group or individual substance abuse treatement" and that the father had not "engaged in any of that treatment[;]" as a result, the children faced an increased likelihood of future abuse or neglect. The psychologist also noted the parents' failure to meet their case plan goals in an expedited manner and expressed his concern that they would be able to do so in the future, including following recommendations for "treatment of the children or any other needs that they

32

may have." Likewise, the mother had been receiving methadone treatment for several years without improvement, stated she was not ready to wean herself from methadone, and had positive drug screens. The foster mother also reported that the mother appeared at a visitation with heavy eyes, "drool[ing]" while speaking, and "food going down her face. . . ." In addition, due to their spotty attendance, the parents had been discharged from substance abuse counseling. According to DFCS case managers, the parents demonstrated no sense of urgency in completing their case plans and opined that the parents' lack of parental care and control was likely to continue. Finally, the guardian at litem reported that the parents "have done nothing to address their substance abuse problems." Inasmuch as the parents' unresolved substance abuse issues were a primary cause of the children's dependency, the juvenile court did not err in concluding that the cause of the children's dependency was likely to continue in view of the parents' failure to address their substance abuse. See *In the Interest of B. S.*, 265 Ga. App. 795, 797-798 (595 SE2d 607) (2004).

(c) *Continued dependency would be harmful to the children.* The parents next contend that the juvenile court erred when it concluded there was clear and convincing evidence that continued dependency would be harmful to the children. We disagree.

33

Based upon the evidence, the root of the parents' challenges is their failure to complete substance abuse counseling and treatment. The parents' inability or unwillingness to address their substance abuse issues would impact the care they would provide their children, including the failure to follow through with treatment recommendations for the children and to maintain stable employment to provide for the children. In particular, the parents have demonstrated no ability or inclination to maintain I. T. M.'s extensive therapy schedule to ensure his progress. Accordingly, we find no error in the juvenile court's determination that continued dependency would be harmful to the children. See *B. S.*, 265 Ga. App. at 798 ("the decision as to children's futures must be based on more than positive promises that are contrary to negative past fact.").

(d) *Termination of parental rights in children's best interests.* Finally, the parents assert that there was insufficient evidence that termination of their rights would be in the children's best interests. We are not persuaded.

> Once
>
> any of the statutory grounds for termination has been met, the court shall then consider whether termination is in a child's best interests after considering the following factors:

34

(1) Such child's sense of attachments, including his or her sense of security and familiarity, and the continuity of affection for such child; . . .

(3) Such child's need for permanence, including his or her need for stability and continuity of relationships with a parent, siblings, and other relatives; and

(4) Any other factors, including the factors set forth in Code Section 15-11-26, considered by the court to be relevant and proper to its determination.

OCGA § 15-11-310 (b). See also OCGA § 15-11-26 (non-exhaustive listing of 20 factors for consideration, including the mental and physical health of the child, evidence of substance abuse in the home, and any recommendation by a guardian ad litem).

Here, the psychologist noted that, based upon their ages and the length of their time in foster care, the children had bonded with the foster parents and that removing them from their foster parents suggested a "high potential that [the children] will experience regression or behavioral problems in the future. . . ." Similarly, the psychologist opined that the parents' inability to complete their case plans "would have a negative impact on [I. T. M.]" in particular and could lead to a regression of

35

the progress I. T. M. had made with his foster parents. I. T. M.'s occupational therapist agreed. Woodward, the DFCS case manager at the time of the termination hearing, noted that the children, who were placed together, were thriving with the foster parents, that they were very attached to the foster parents, and that "it's like they belong there." The foster parents, who are relatives of the father, also expressed a desire to adopt the children. Furthermore, the DFCS case managers and the guardian ad litem recommended termination of the parents' rights and they agreed, as did the psychologist, that terminating the parents' rights would be in the children's best interests. As a result, the juvenile court did not err in concluding that termination of the parents' rights would be in the best interests of the children.

In sum, we find that there was clear and convincing evidence: (1) of dependency, based upon the juvenile court's prior unappealed orders; (2) that the causes of the children's dependency were likely to continue; (3) that continued dependency would be harmful to the children; and (4) that termination of parental rights was in the children's best interests. Accordingly, we conclude that the juvenile court did not err in terminating the parents' rights to I. L. M., I. T. M., and B. M.

3. Next, the parents contend that their due process rights were violated because DFCS failed to file a copy of their case plan with the juvenile court during the 33-month pendency of their case. This argument lacks merit.

Pursuant to OCGA § 15-11-200 (a), DFCS is required to submit a written report to the juvenile court "which shall either. . .[i]nclude a case plan for a reunification of the family; or [i]nclude a statement of the factual basis for determining that a plan for reunification is not appropriate." The written report must be submitted "[w]ithin 30 days of the date a child who is placed in DFCS custody is removed from his or her home and at each subsequent review of the disposition order. . . ." Id. Such case plans must be "sufficiently plain, clear, and definite to comport with the requirements of due process." *In the Interest of S. L. W.*, 221 Ga. App. 509, 511 (2) (471 SE2d 579) (1996), overruled on other grounds, *In the Interest of C. W. S.*, 231 Ga. App. 444, 447-448 (3) (498 SE2d 813) (1998). However, unless a parent can establish harm caused by an alleged due process violation, reversal is not warranted. *In the Interest of D. T.*, 284 Ga. App. 336, 342 (3) (b) (643 SE2d 842) (2007); *In the Interest of B. D.*, 281 Ga. App. 725, 728 (3) (637 SE2d 123) (2006).

In this case, both DFCS case managers confirmed that the parents' case plan was not timely filed with the juvenile court. Indeed, the juvenile court chastised

DFCS for its failure to timely file the case plan. The parents' primary argument, which permeates their briefing to this Court, appears to be that they did not participate in the "Rejuvenate Hope" program because "the case plan stating that requirement was never given to them" and they believed "the program was a suggestion rather than a requirement."[27] However, the evidence revealed that the parents were aware of the Rejuvenate Hope program but, for whatever reason, did not participate. For example, as early as January 2014, the juvenile court specifically ordered that the parents "shall participate in the 'Rejuvenate Hope' program. . . ." In addition, the father acknowledged that DFCS provided he and the mother with a referral for the program but indicated "[t]hat's one thing I think we didn't do, was the Rejuvenate Hope. I wish we would have done it. . . ." Further testimony by DFCS case manager Cash revealed that the parents "did not take part in the [Rejuvenate Hope] program because they would not contact the provider back."

---

[27] The parents' statement in their appellant's brief that DFCS's failure to provide a case plan "was harmful because there was inconsistent testimony . . . about what [had] actually been completed or substantially completed in the parents' case plan" neither identifies the conflicting testimony and the items allegedly completed nor provides a citation or citations to the record in support of the statement. Accordingly, to the extent the parents' statement is a distinct argument for reversal, it is deemed abandoned. See Court of Appeals Rule 25 (c) (2) (i); *Ratliff v. CSX Transp.*, 219 Ga. App. 53, 56 (3) (464 SE2d 1) (1995).

Moreover, several factors contradict the parents' claim that their due process rights were violated, including the parents' awareness that their children were in DFCS custody, the parents' participation in citizen review panel meetings and in review of their case plans with the case managers, evidence of services offered by DFCS, and the parents' sporadic contact with DFCS. See *D. T.*, 284 Ga. App. at 342 (3) (b); *B. D.*, 281 Ga. App. at 729 (3). Accordingly, in view of the parents' failure to demonstrate harm, we conclude that this enumeration is without merit. See *D. T.*, 284 Ga. App. at 342 (3) (b); *B. D.*, 281 Ga. App. at 728-729 (3).

In conclusion, we find that the record contains clear and convincing evidence of dependency as to I. L. M., I. T. M., and B. M. and that termination of the parents' rights was in the children's best interests. Likewise, we conclude that the parents' due process rights concerning the filing and notice of their case plan were not violated in view of evidence of their familiarity with the requirements expected of them. Accordingly, we affirm the juvenile court's order terminating the parents' rights to I. L. M., I. T. M., and B. M.

*Case No. A16A1768*

4. We next address the parents' argument that the juvenile court's conclusions concerning E. G. M.'s dependency are not supported by clear and convincing

39

evidence. Specifically, E. G. M.'s parents contend that DFCS failed to present clear and convincing evidence of chronic and unresolved substance abuse or mental health issues.

As we discussed in Division 2, supra, a "'[d]ependent child' means a child who . . . [h]as been abused or neglected and is in need of the protection of the court. . . ." OCGA § 15-11-2 (22) (A). "'Neglect' means . . .[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals. . . ." OCGA § 15-11-2 (48) (A). Relevant to E. G. M.'s case, a factor to be considered in determining whether a child is without "proper parental care and control" is a parent's "[e]xcessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent of such child incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his or her child. . . ." OCGA § 15-11-311 (a). Furthermore,

> [i]n making these determinations, the juvenile court may consider evidence of present parental misconduct or inability, as well as evidence of past misconduct. Such an inference is appropriate, since the juvenile court is not required to reunite a child with a parent in order to obtain current evidence of deprivation or neglect.

(Punctuation omitted.) *B. S.*, 265 Ga. App. at 798. See also *In the Interest of D. D. B.*, 282 Ga. App. 416, 418 (1) (638 SE2d 843) (2006) (while "'evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child,'" juvenile court permitted to consider evidence of mother's past conduct).

Viewed in a light most favorable to the juvenile court's judgment,[28] evidence revealed that the juvenile court terminated the parents' rights to E. G. M.'s siblings in July 2015 due to the parents' "'excessive use of or history of chronic unrehabilitated substance abuse. . . .'"[29] Less than three months later, E. G. M. was born on October 4, 2015.[30] At the time of his birth, E. G. M. was four weeks premature and addicted to methadone.[31] DFCS received a report of E. G. M.'s condition and filed a complaint on October 8, 2015. In the complaint, DFCS noted:

---

[28] See *S. C. S.*, 336 Ga. App. at 244; Division 1, supra.

[29] For a more detailed discussion of the juvenile court's termination order, see Divisions 1 and 2, supra.

[30] In fact, the mother denied being pregnant during the July 2015 termination of rights hearing.

[31] As a result, doctors provided E. G. M. with morphine for over a month to control E. G. M.'s withdrawal symptoms. Moreover, the mother was aware of the effects of methadone withdrawal on newborns because B. M. had also been born addicted to methadone.

(1) the infant's addiction to methadone; (2) the infant's premature birth; (3) the July 2015 termination of the parents' rights to the couple's three other children; (4) the mother's failure to visit the hospital after being discharged following E. G. M.'s birth; (5) the parents' history of drug abuse; and (6) the parents' lack of, or inability to demonstrate, employment. Based upon these factors, the juvenile court entered a protective custody order on the same day and placed custody of E. G. M. with DFCS.

DFCS then filed a petition for dependency alleging, in pertinent part, that E. G. M. was dependent based upon the parents' "unresolved and chronic substance abuse issues for which [they have] failed to complete treatment" and "unresolved mental health issues . . . which [they have] failed to address."[32] DFCS further asserted that the mother "consistently tested positive for methadone and benzodiasepines throughout [the termination case]." The juvenile court adjudicated E. G. M. dependent "in that he has been abused or neglected and is in need of the protection of the Court" based upon the parents' "[c]hronic and unresolved substance abuse issues . . . and [c]hronic and unresolved mental health issues."

---

[32] Additional allegations of dependency included the parents' prenatal abuse, lack of stable and adequate employment, and lack of appropriate parenting skills.

42

Relevant to the juvenile court's conclusions concerning E. G. M.'s dependency, evidence from E. G. M.'s adjudication hearing demonstrated that the mother received counseling and a doctor's care for substance abuse, including her continued methadone treatment. At the time of the adjudication hearing, the mother's methadone dosage had increased to 150 milligrams from 130 milligrams in July 2015. The mother visited the methadone treatment facility daily, in part, because there had been occasions when she was not permitted to take medications home with her. In addition to her methadone treatment, the mother also received treatment for depression, including visits to a doctor and prescription medication. She also attended NA meetings "some Wednesday nights" and stated that "[s]ometimes we make it to NA classes[;] [s]ome times we don't." The mother continued to deny having any substance abuse problems and acknowledged that she had no additional substance abuse therapy since July 2015, aside from the methadone treatment facility. Nevertheless, the mother was aware of the harmful effects of methadone withdrawal on newborns because, like E. G. M., B. M. had also been born addicted to methadone.

Similarly, the father acknowledged his prior conviction related to methamphetamines but stated that he had "not really" sought any substance abuse treatment or counseling aside from attending "a few . . . NA classes" and talking to

his doctor. In addition, he admitted receiving counseling "sometimes" for anxiety and depression and taking prescription medications to address both conditions. He denied any substance abuse problem.

The guardian ad litem reiterated the parents' history of substance abuse and noted that the parents

> are addicts. Both parents in the termination hearing admitted to being addicts. As they sat here today, both of them said they were not addicts. They had no intention of seeking any help for any substance abuse because they don't believe that they have any substance abuse issues.

She further stated that the parents "are what's commonly referred to as pill poppers" and "know exactly what they need to say to the doctor to get a particular prescription." For example, the guardian cited the father's visits to the methadone treatment facility for pain relief and his oxycodone prescription for a common urinary tract infection. She also reported that "[t]he fact that [the parents] had their rights terminated to three of their children and not changed one iota of their behavior shows they are content with living the way they do." She recommended that the juvenile court adjudicate E. G. M. dependent, arguing that "[i]f termination of three children is not going to change their behavior, nothing that [DFCS] can do will change their behavior."

At the conclusion of the adjudication hearing, the juvenile court announced that DFCS failed to prove lack of stable housing and prenatal abuse as grounds for dependency. However, the juvenile court found clear and convincing evidence of the parents' "chronic unresolved substance abuse and unresolved mental health issues. . . ." In its written order, the juvenile court adjudicated E. G. M. dependent "in that he has been abused or neglected and is in need of the protection of the Court" based upon the parents' "[c[hronic and unresolved substance abuse issues . . . and [c]hronic and unresolved mental health issues."

Furthermore, as part of its consideration of E. G. M.'s dependency, the juvenile court recalled its order terminating the parents' rights to E. G. M.'s three siblings, filed just two days after his birth.[33] That order chronicled the parents' extensive histories with substance abuse issues, including the mother's methadone treatment for several years without improvement, her denial of a substance abuse issue, and her "unresolved and chronic substance abuse issues" resulting in a lack of "ability to meet the needs of I. L. M., I. T. M., and B. M." Similarly, the juvenile court noted the father's "longstanding history of substance abuse of marijuana, alcohol, and methamphetamine" and use of "heroin, cocaine, MDMA, LSD, and hallucinogenic

---

[33] See n. 2, supra.

mushrooms[,]" his failure to " participate in any treatment to address his mental health and substance abuse issues despite receiving a recommendation for substance abuse treatment," and his visit to a methadone clinic for the improper purpose of pain relief.

Standing alone, these past behaviors may not warrant a finding of present dependency. See *D. D. B.*, 282 Ga. App. at 418 (1). However, what is telling is that the conditions which led to the July 2015 termination of rights – specifically, the parents' "excessive use of or history of chronic unrehabilitated substance abuse" – persisted unchecked at the time of E. G. M.'s adjudication hearing in January 2016. For example, the parents admitted that they only sporadically attended NA meetings and denied having substance abuse issues. The mother revealed that she had no additional substance abuse therapy since July 2015, aside from daily visits to the methadone treatment facility. In fact, the mother's methadone use not only continued, resulting in E. G. M's addiction to methadone and month-long hospitalization following his birth, but her methadone prescription increased following the July 2015 termination of rights.[34] Likewise, the father stated that he had "not really" sought any

_____

[34] Indeed, the mother's increased methadone prescription supports the juvenile court's conclusion that her chronic substance abuse issues remain unresolved, particularly in view of the psychologist's testimony, during the July 2015 termination

substance abuse treatment or counseling aside from attending "a few . . . NA classes" and talking to his doctor. In short, the parents' behavior, which led to the termination of their parental rights to E. G. M.'s siblings, had not been resolved at the time of E. G. M.'s adjudication hearing. See, e.g., *B. S.*, 265 Ga. App. at 798 (despite termination of parental rights to six other children, mother "made no significant attempts" to receive addiction treatment). Accordingly, we conclude that clear and convincing evidence supported the juvenile court's conclusion that E. G. M. is a "dependent child" based upon his parents' chronic and unresolved substance abuse issues. See OCGA § 15-11-2 (22) (A); *In the Interest of Q. A.*, 306 Ga. App. 386, 388-389 (2) (702 SE2d 701) (2010).

Conversely, the juvenile court's finding that the parents suffered from "unresolved mental health issues" is not supported by the record. During the parents' termination of rights hearing, the psychologist relayed his diagnosis of each parent with various psychological conditions, including depression. He also testified that a risk factor that increases the likelihood a child may be abused or neglected is a parent's untreated mental health issues, and "that's true for [the father]." However,

---

hearing, that the mother "must reduce her methadone levels so that she can adequately address her substance abuse issues."

47

two DFCS case managers testified that DFCS had made no referrals to address the parents' mental health.[35] During E. G. M.'s dependency hearing, both the mother and the father testified that they were under a doctor's care and taking medication for their conditions. Nevertheless, the juvenile court concluded that DFCS presented clear and convincing evidence of the parents' unresolved mental health issues.

As a result, the juvenile court erred in one finding, but not every finding, in support of its conclusion that E. G. M. was dependent due to the lack of proper parental care or control by his parents. See *Blue v. Hemmans*, 327 Ga. App. 353, 359 (1) (759 SE2d 72) (2014) (child custody matter).

> If the trial court clearly errs in a material factual finding, the trial court's exercise of discretion can be affirmed only if the appellate court can conclude that, had the trial court used the correct facts and legal analysis, it would have had no discretion to reach a different judgment.

(Citation, punctuation and emphasis omitted). Id. In this case, even had the juvenile court made a correct finding concerning the lack of evidence of the parents' "unresolved mental health issues," the clear and convincing evidence of the parents'

---

[35] This evidence belies testimony by a third DFCS case manager during the dependency hearing that DFCS had "offered [the parents] pretty much every service that we have to address mental health . . . and really nothing's changed."

"unresolved substance abuse issues" would have required the juvenile court to adjudicate E. G. M. dependent. See, e.g., OCGA §§ 15-11-2 (22) (A), 48 (A); 15-11-310 (a) (5); 15-11-311 (a) (2). Cf. OCGA § 15-11-320 (a) ("When the court finds that *any* ground set out in Code Section 15-11-310 is proved by clear and convincing evidence and that termination of parental rights is in a child's best interests, it *shall* order the termination of the parent's rights.") (emphasis supplied). As a result, despite the juvenile court's erroneous finding, we conclude that a remand is unnecessary. Compare *In the Interest of K. S.*, 271 Ga. App. 891, 893 (611 SE2d 150) (2005) (court reversed juvenile court's finding of deprivation based upon mother's mental illness due to lack of clear and convincing evidence).

5. Next, the parents contend that the juvenile court erred by continuing the adjudication hearing from October 2015 to January 2016 without good cause. This argument is without merit.

OCGA § 15-11-181 (a) provides that courts "shall fix a time for an adjudication hearing" and that "[i]f the alleged dependent child is in foster care, the hearing shall be scheduled for no later than ten days after the filing of the petition alleging dependency." However, a hearing in a dependency proceeding may be continued "upon a showing for good cause and only for that period of time shown to be

necessary by the evidence presented at the hearing on the motion."[36] OCGA § 15-11-110 (a), (b). Moreover, "[a] juvenile court has the authority to grant a continuance of a properly set deprivation hearing, for good cause, even beyond the statutory limitations for the time of the hearing." (Punctuation omitted.) *D. T.*, 284 Ga. App. at 341 (3) (a) (citing *In the Interest of T. R.*, 270 Ga. App. 401 (1) (606 SE2d 630) (2004)). See also Uniform Juvenile Court Rule 11.3 ("the court may continue a hearing for a reasonable time upon good cause shown"). "A trial court's decision to grant or to deny a continuance will not be disturbed absent abuse of discretion." (Citation omitted.) *D. T.*, 284 Ga. App. at 341 (3) (a).

In this case, as noted in Division 4, supra, the juvenile court entered a protective custody order on October 8, 2015, and placed custody of E. G. M. with DFCS; in the order, the juvenile court scheduled an adjudication hearing for October 22, 2015. On that date, the juvenile court "on its own motion" continued the hearing due to a "lengthy court docket."[37] In support of its decision, the juvenile court noted

---

[36] While Chapter 11 of Title 15 does not define "good cause," OCGA § 15-11-110 (c) supplies examples of reasons which do not constitute good cause, including stipulations between counsel, convenience of the parties, and the need for discovery.

[37] Although the record does not include a transcript of the October 22, 2015 court appearance, it does not appear that any party moved for a continuance; in fact, the juvenile court noted in its continuance order that the parents objected to the

that E. G. M.'s adjudication hearing had been scheduled for 8:30 a.m. with more than twenty other cases, including "a lengthy detention hearing[,]" that E. G. M.'s case was not called until 3:30 p.m., and that "there is no time to complete the trial in this matter on today's date." The juvenile court further observed that E. G. M. remained hospitalized with no discharge date, that E. G. M.'s parents were "able to visit multiple times per week at the hospital[,]" that the parents' supervised visitation would continue, and that E. G. M.'s placement in DFCS custody was "stable and appropriate and the child's needs are presently being met." Finally, while noting the ten-day requirement of OCGA § 15-11-181 (a), the juvenile court specially set E. G. M.'s adjudication hearing for November 18, 2015, since that was "the next available court date."[38]

In response, the parents filed a motion to dismiss the dependency petition on November 13, 2015, asserting that the delay: (1) contravened the scheduling provisions of OCGA §§ 15-11-110 and 15-11-181; (2) "limited the parents' opportunity to bond with [E. G. M.]"; and (3) failed to afford "substantial weight to

continuance.

[38] On November 3, 2015, "[d]ue to a court scheduling conflict," the juvenile court rescheduled the adjudication hearing to November 17, 2015.

[E. G. M.'s] need for prompt resolution of his custody status." On November 17, 2015, the juvenile court alerted the parties that it would not reach their case "due to a contested Superior Court matter" and that the adjudication hearing would again be rescheduled.[39] With their first motion to dismiss still pending, the parents filed a second motion to dismiss in view of the continuance from November 17, 2015. Thereafter, the juvenile court specially set the adjudication hearing for, and ultimately conducted the hearing on, January 12, 2016.

In considering the parents' motions to dismiss, the juvenile court noted DFCS's arguments that the continuance "was not contrary to the interests of the child" because E. G. M. was born addicted to methadone and required medical treatment in a hospital and because E. G. M.'s parents were given the opportunity to visit E. G. M. in the hospital. The juvenile court stated that it "has two (2) judges, who preside over a dependency calendar two (2) days per week on a rotating basis" and that its policy "is to specially set a court hearing if the parties announce it may take over four (4) hours to present the contested case." After the parties announced that the adjudication hearing was contested, the juvenile court "continued the case based upon insufficient

---

[39] Absent from the record is a transcript of the November 17, 2015 court appearance.

52

time to hear the contested trial due to the lengthy court docket on that date." Ultimately, the juvenile court denied the parents' motions to dismiss, concluding that "there was good cause to continue based upon the lengthy court docket, leaves of absence filed by attorneys, and the Holiday schedule."[40]

In sum, the juvenile court reviewed a variety of factors related to "the need for a prompt resolution of the custody status, the need for a stable environment, and the need to eliminate prolonged temporary placements[,]" including E. G. M.'s need for hospitalization to address his methadone addiction, E. G. M.'s parents' continuing ability to visit E. G. M. "multiple times per week at the hospital[,]" and that E. G. M.'s placement in DFCS custody was "stable and appropriate and the child's needs are presently being met."[41] Against these issues, the juvenile court balanced its own need to fully consider the petition for dependency in view of the juvenile court's overcrowded docket and determined that a continuance would not be contrary to E.

---

[40] Of note, the record does not contain any "leaves of absence filed by attorneys" in the case. Rather, counsel for the mother filed a conflict letter in advance of the adjudication hearing scheduled for November 17, 2015.

[41] Although the parents contend that the continuance led to decreased visitation and that the mother reached out to DFCS concerning visitation as recently as December 2015, additional evidence during the January 2016 adjudication hearing indicated that the parents did not express concerns about visitation until the eve of the hearing.

G. M.'s interests. See OCGA § 15-11-110 (a). Under these circumstances, we find no abuse of the juvenile court's discretion.[42] See *D. T.*, 284 Ga. App. at 341 (3) (a); *T. R.*, 270 Ga. App. at 401-402 (1).

6. Finally, the parents argue that the juvenile court's written order of dependency contradicted its oral rulings at the conclusion of the adjudication hearing. In particular, the parents contrast the juvenile court's oral pronouncements that there was no evidence of current unstable housing, current unstable employment, or prenatal abuse based upon the mother's use of methadone with its written findings of fact that the mother's use of benzodiazepines and methadone "causes severe sedation, which places the newborn at extreme risk of harm"[43] and that the parents "are unable to provide all of the needful and necessary parental care, guidance, and supervision required to assure the health, safety, welfare, and wellbeing of [E. G. M.]. . ."

---

[42] *In the Interest of R. B.*, 309 Ga. App. 407 (710 SE2d 611) (2011), cited by the parents in support of their argument concerning the juvenile court's continuance, does not substantively address continuances and is therefor inapposite.

[43] This finding appears to be based upon an allegation in the petition for dependency, which itself germinates from a finding of fact by the juvenile court in its order terminating the parents' rights to E. G. M.'s older siblings. In that case, the program director of the mother's methadone treatment facility testified that "Benzodiazepines . . . can cause severe and extreme sedation when used in conjunction with methadone." See also Division 1 (b), supra.

However, these alleged errors were not the bases for the juvenile court's determination of dependency in its written order. The first alleged error, concerning the effect on E. G. M. of the mother's possible use of a cocktail of benzodiazepines and methadone, does not impact the juvenile court's conclusion that "neglect" occurred based upon the mother's "failure to provide proper parental care or control."[44] See OCGA §§ 15-11-2 (48) (A), 15-11-311 (a). Rather, the juvenile court found E. G. M. dependent based upon the parents' "[c]hronic and unresolved substance abuse issues. . . ." Similarly, the second alleged error, regarding the parents' present inability to provide for E. G. M.'s welfare, is supported by the record. In fact, as we discussed in Division 4 supra, DFCS presented clear and convincing evidence of these factors and that the parents' behavior had continued unabated since the July 2015 termination of their parental rights to E. G. M.'s siblings. As the juvenile court aptly observed, "[i]f losing their parental rights as to three children does not encourage the parents to change, then there is nothing else that will. . . ."

---

[44] The parents' argument on this point sounds in "abuse" and "prenatal abuse" as those terms are defined in the Juvenile Code, see OCGA §§ 15-11-2 (2) (D) and 15-11-2 (56) (A), rather than "neglect." See OCGA § 15-11-2 (48) (A), 15-11-311 (a).

Nevertheless, even assuming the two findings of fact cited by the parents were unsupported by the record, the parents have failed to demonstrate harm resulting from the alleged errors. See generally OCGA § 9-11-61; *S. C. S.*, 336 Ga. App. at 246 (1) (b) ("a misstatement in a finding of fact contained in a dependency order is not reversible error unless the appellant can show that the misstatement was harmful.") (Citation and punctuation omitted); *In the Interest of D. R.*, 298 Ga. App. 774, 779 (2) (681 SE2d 218) (2009) (on appeal, party "required not only to show error, but harm as well") (footnote omitted), overruled in part on other grounds, *In re A. C.*, 285 Ga. 829, 833 (1), n. 3 (686 SE2d 635) (2009). As a result, this enumeration is without merit.

In conclusion, because we find that the record contains clear and convincing evidence of the parents' chronic and unresolved substance abuse issues, we affirm the juvenile court's order adjudicating E. G. M. as a "dependent child."

*Judgments affirmed. Barnes, P. J., and Rickman, J., concur.*