**March 16, 2018**

# In the Court of Appeals of Georgia

A17A1595. IN THE INTEREST OF R. S. T., a child.

McMILLIAN, Judge.

In 2013, the biological mother of R. S. T. first appealed a juvenile court order finding her minor daughter deprived. This Court reversed the order after finding the Fulton County Department of Family and Children Services (the "Department") failed to present clear and convincing evidence of present deprivation. *In the Interest of R. S. T.*, 323 Ga. App. 860 (748 SE2d 498) (2013). On remand, the Department filed a new dependency petition,[1] and the mother's rights were ultimately terminated in March 2016. The mother filed an application for discretionary appeal from this latest

---

[1] Where appropriate, we apply the new Juvenile Code to these proceedings because, although the State filed the initial deprivation petition in 2012, the State's termination petition was later filed in August 2015, after the new Code went into effect on January 1, 2014. See *In the Interest of J. A. B.*, 336 Ga. App. 367, 367 (785 SE2d 43) (2016) (new Juvenile Code uses the term "dependent" instead of "deprived"); Ga. L. 2013, p. 294, § 5-1.

order, which this Court granted.[2] For the reasons that follow, we vacate and remand this case for further proceedings consistent with this opinion.

On appeal, we review an order terminating parental rights in the light most favorable to the juvenile court's findings to determine whether any rational trier of fact could have found by clear and convincing evidence that the mother's right to custody should have been terminated. *In the Interest of A. B.*, 311 Ga. App. 629, 629 (716 SE2d 755) (2011). So viewed, the record shows that R. S. T. was born in July 2012. Shortly after her birth, R. S. T. was taken into care by the Department due to concerns regarding the mother's mental health, her ability to provide for R. S. T., and the mother's non-cooperation with a case plan that had been developed for the mother's seven other children who had previously been adjudicated deprived. *In the Interest of R. S. T.*, 323 Ga. App. at 861. The Department then filed a deprivation petition, alleging that the mother suffered from a psychotic disorder and failed to complete treatment sufficient to ensure that her older children could be returned to the home. The Department also alleged the older children had previously been

---

[2] The Department's petition for termination of parental rights also included the putative father, whose whereabouts were unknown. However, only the mother appeals from the termination order.

subjected to a home without utilities and suffered medical neglect and other abuse, and the Department feared R. S. T. would suffer a similar fate.

After this Court reversed the juvenile court's first order finding R. S. T. deprived,[3] the Department immediately filed a second deprivation complaint. The Department alleged the mother's oldest child had been returned to her earlier in the year but was assaulted while in her care and removed again. Following a hearing, the juvenile court found R. S. T. deprived but granted the mother temporary custody in October 2013. However, by January 2014, R. S. T. was returned to the Department's custody due to concerns regarding alcohol and physical abuse. In the fall of 2014, the Department filed a new dependency petition, and following a hearing in December 2014, the juvenile court entered an order finding that R. S. T. was a dependent child. Specifically, the juvenile court found that the mother remained unemployed, even though she was capable of finding employment, and unable to provide for the daily financial needs of R. S. T. and that her mental health issues adversely affected her ability to provide adequate care, control or supervision of the child. The juvenile court also found that the guardian of several of the mother's other children and

[3] The juvenile court entered its first order of adjudication finding R. S. T. deprived on August 30, 2012.

another witness had repeatedly heard the mother curse and scream and witnessed the mother shove one of her other daughters against a wall and knee her in the stomach. Based on these and other findings, the juvenile court ordered that custody of R. S. T. remain with the Department and approved a concurrent reunification and adoption plan.

In August 2015, the Department filed a petition for termination of parental rights, and a hearing on the petition was held in March 2016. At the hearing, the juvenile court heard testimony from multiple psychologists, three Department case workers, the court-appointed guardian ad litem, and the mother. The Department presented testimony that a case plan was developed early on wherein the mother was to maintain stable and suitable housing and sufficient income, follow all recommendations from her providers, and also undergo psychological and parental fitness assessments and take parenting classes. Angela Maxwell, the first case manager assigned to R. S. T.'s case, testified that the Department was unable to confirm in 2012 whether the mother completed the required parenting skills or psychological assessments because she refused to use the Department's providers, stating instead that she wished to use her own provider.

A new case plan was developed in 2013 with the same goals. However, by 2014, the only goal the mother completed was attending parenting training classes. The mother was frequently verbally aggressive with members of the Department, including towards Maxwell on multiple occasions throughout her years assigned to R. S. T.'s case. In early 2015, the Department attempted to convene a family meeting to review the mother's case plan goals, but the meeting had to be stopped because the mother became "very irate and aggressive." The mother cursed at Maxwell and appeared to want to fight her physically before Maxwell left the room, and the mother left the building. Throughout this time, the mother remained without employment, receiving only social security payments, and was evicted from her apartment for failure to pay rent. She also refused to pay her required child support.

After the mother visited R. S. T. in May 2015, she informed the visitation provider that she did not wish to visit with R. S. T. any more. The mother also told a case manager that she only wanted visitation if it was at her home and unsupervised. In July 2015, a case manager personally delivered a MARTA card to the mother so she could visit the child and participate in the services offered by the Department. While at the mother's residence, the case manager observed that it was very cluttered, that the landlord had sectioned off a portion of the living room to serve as the

mother's bedroom, and that the mother had a large dog. The mother remained "very adamant" that she would not cooperate with the Department or use the services it provided. Another case manager also testified that in most of her interactions with the Department, the mother was aggressive, making it difficult to ascertain which providers the mother may have been seeing.

In December 2015, the Department contacted the mother regarding visitation, but the mother once more reported that she would not visit her child again unless the visits were unsupervised. The mother also admitted to the new case manager that "every now and then she [smokes] marijuana" and that she was out of her prescribed medication. When the case supervisor contacted the mother later that month, the mother cursed at her and told her not to call anymore before hanging up. The mother again refused visitation with R. S. T. in January 2016. She eventually attended one visitation with R. S. T. in March 2016 but complained about the location. The Department agreed to change the location for the next visit, but the mother then cancelled the next scheduled visit.

The current case manager testified at the termination hearing that she had visited the mother's most current residence and did not feel it was appropriate for R. S. T. as the mother was living with her boyfriend, his mother, his mother's husband,

6

and his mother's great granddaughter in a two-bedroom apartment.[4] None of these individuals had ever met R. S. T. Although the mother stated that R. S. T. would be able to share a bedroom with the other child, she did not have a bed for R. S. T. in that room. Moreover, the Department did not have any information regarding the other adults residing in the home, and the mother did not have a lease or other legal arrangement with either the landlord or legal tenant to live there with R. S. T. She had moved in only two weeks prior to the hearing after she and her prior landlord had "an issue." When questioned by her own counsel about her future plans with her boyfriend, the mother became argumentative and repeatedly replied, "It's none of your business."

Dr. Andrew Gothard, a psychologist who performed a psychological and parental fitness evaluation on the mother,[5] testified that he learned through his interview with her that she was not employed and relied solely on social security benefits. She also had zero social support, meaning she had neither family nor friends

---

[4] The mother had been in a relationship with the boyfriend for six months at the time of the hearing.

[5] As part of the evaluation, Gothard reviewed records and information from R. S. T.'s current case manager and a previous psychological evaluation in addition to reviewing the results of several tests he administered. However, the mother refused to finish the "parenting stress index" test.

that she could rely on for assistance, save one member of her church and professionals who were providing services to her. She admitted to drinking vodka at least once per week but refused to clarify the frequency or the quantity. She also admitted to smoking marijuana "socially." Gothard was particularly struck by the mother's proud assertion that – despite having nine children in total from five different fathers and her problems with caring for those children – she intended to have additional children.

Gothard further testified that, although the mother acknowledged a prior history of mental health issues, she was "vague and guarded" in her description. At one point during the testing, her mood shifted very dramatically and inexplicably. She told Gothard, "I'm not with game playing now; I'm getting irritated; now I'm getting aggressive; you just ask me straight up." The mother denied any current significant mental health issues, but reported taking Seroquel, which would not typically be prescribed absent a mental health concern. Gothard found the mother's behavior to be suggestive of bi-polar disorder and her test scores indicative of antisocial behavior. However, although her prior records included diagnoses of bipolar disorder, psychotic disorder, personality disorder, anxiety disorder, and depressive disorder, Gothard did not feel he could give a definitive diagnosis due to the mother's

defensiveness, inconsistent responses, and refusal to complete all the testing. Therefore, he advised that the mother should "continue to receive any and all mental health and allied support services that were in place," including psycho-therapy, psychiatric medication, and substance abuse treatment if needed.

Dr. Carolyn Johnson, a clinical psychologist who performed a bonding assessment on R. S. T. and her foster parents, testified that it is critical that children form attachments before age three. At four years of age, children begin taking their secure attachments into the world and must know that they have a "secure base" that will be there for them. R. S. T., who was approaching four years old, had been living with her foster parents for approximately 18 months. Johnson found R. S. T. was very attached to her foster parents and demonstrated that she considered them to be a secure attachment, able to meet her needs and to provide a safety net and source of support. Johnson testified that if R. S. T. did not maintain this permanency, "breaking the attachment she has to her foster parents [would] be a problem for her." Breaking this attachment at R. S. T.'s age is a traumatic process that can cause grief, anger, depression, and feelings of hopelessness. Johnson explained that children with a disrupted attachment also have a greater chance of developing problems later in life, such as difficulty making and keeping friends, anxiety, diminished coping skills, and

9

involvement in delinquency. Johnson also testified that a lack of visits or irregular visits are another cause of concern for R. S. T. The current case manager also testified that R. S. T. had a "very strong relationship" with her foster parents, who wished to adopt her.

Deborah Higgins, the mother's therapist, testified that she is working with the mother on regulating her emotions and anger management issues. According to Higgins, relationships remain a struggle for the mother because she suffers from a personality disorder that requires a lengthy therapeutic treatment course. Higgins is also treating the mother for her current diagnosis of major depression. The mother is currently taking Depakote, which Higgins acknowledged is often prescribed to treat bipolar disorder, which Gothard had testified was one of the mother's prior diagnoses. Higgins counseled the mother against stopping her visitation with R. S. T., but she did not heed the advice.

The mother also testified at the hearing. She claimed that she recently began work as a child care assistant two weeks prior to the hearing, but refused to provide the company's name and would not explain how she applied for the job or came to get the job. She received $652 in social security benefits and $56 in food stamps per month. She claimed that she was currently compliant in taking her medication, which

helped her remain calm, and that she received mental health counseling for her anger management issues. She ceased taking the Seroquel and was no longer taking any medication for bipolar disorder.

At one point during her testimony, the mother left the witness stand, declaring that she did not want to answer any more questions. She eventually returned when the court intervened and told her to return to the stand, but again refused to respond to questions from R. S. T.'s attorney. When the juvenile court questioned the mother, she admitted to her lack of visitation with R. S. T., stating "I've just been wanting to have my time with her without it being an inconvenience."[6] When asked how she felt her lack of visitation for over six months affected R. S. T., the mother responded, "I don't know if it did or not."

On April 25, 2016, the juvenile court entered an order terminating the mother's parental rights. The mother filed a motion for new trial, which the juvenile court denied. This appeal followed.

1. We begin by noting that "[t]erminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is

---

[6] However, the evidence shows that the mother had been receiving a half-price MARTA card through other services for over a year.

11

governmental extinguishment of the parent and child's constitutional right to familial relations." (Citation and punctuation omitted.) *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015). Thus, "our analysis is guided by an overarching constitutionally based principle that the termination of parental rights is a remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the [dependency] is likely to continue." Id. at 742.

A juvenile court's termination of parental rights involves a two-step process. First, the court must determine whether at least one of the five statutory grounds for termination enumerated in OCGA § 15-11-310 (a) has been met. Here, the Department proceeded under OCGA § 15-11-310 (a) (5), which provides a ground for termination when:

> A child is a dependent child due to lack of proper parental care or control by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child.[7]

---

[7] A "dependent child" is statutorily defined as a child who "(A) [h]as been abused or neglected and is in need of the protection of the court; (B) [h]as been

In her first and second enumeration of errors, the mother argues that there was insufficient evidence to show that R. S. T. was dependent due to a lack of proper parental care and control and that, if she were dependent, there was insufficient evidence to show that any dependency was likely to continue. We disagree as to both contentions.

(a) In assessing whether a child is dependent due to lack of proper parental care and control, the juvenile court may consider, inter alia, the following factors:

> A medically verified deficiency of [the] parent's physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child; . . . Excessive use of or history of chronic unrehabilitated substance abuse with the effect of rendering a parent . . . incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of his or her child; . . . [and] . . . Physical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent[.]

OCGA § 15-11-311 (a) (1), (2), & (5). And in making this determination when the child is not in the custody and care of his or her parent, the court must also consider

placed for care or adoption in violation of law; or (C) [i]s without his or her parent, guardian, or legal custodian." OCGA § 15-11-2 (22).

13

whether the parent has significantly failed, without justifiable cause, for a period of six months prior to the date of the termination hearing:

> (1) To develop and maintain a parental bond with his or her child in a meaningful, supportive manner; (2) To provide for the care and support of his or her child as required by law or judicial decree; and (3) To comply with a court ordered plan designed to reunite such parent with his or her child.

OCGA § 15-11-311 (b).

The record here clearly supports the juvenile court's finding that R. S. T. was currently dependent at the time of the hearing. As summarized above, the mother failed to maintain visitation with R. S. T. from May 2015 to March 2016, with only sporadic visitation prior to May 2015.[8] She also failed to provide child support, refused to provide proof of her income, and was currently living in a two-bedroom home with four other individuals, none of whom had been screened by the Department or ever met R. S. T. See *In the Interest of B. D. O.*, 343 Ga. App. 587, 591 (1) (807 SE2d 507) (2017) (parent's failure to pay child support is compelling evidence she is not an able parent); *In the Interest of P. D. W.*, 296 Ga. App. 189, 194

---

[8] For example, in September 2013, the mother requested that her weekly visits be changed to every other week.

(1) (b) (674 SE2d 338) (2009) (Georgia law requires parents to financially support their children while in foster care, even absent a court order, and even if unable to earn income). Significantly, the mother suffered from serious mental health issues, which she denied, even though she was taking some medication and receiving some counseling. See *In the Interest of S. P.*, 336 Ga. App. 488, 497 (2) (a) (784 SE2d 846) (2016) (affirming finding of dependency where mother was unable or unwilling to address her psychological issues).

The mother asserts that at the time of the hearing, she had made "measurable strides" in meeting her case plan goals. However, we have repeatedly acknowledged that "in considering past deprivations compared to present achievements, juvenile courts are entitled to assign much less weight to such assertions of sudden parental fitness when compared to other evidence." (Citation and punctuation omitted.) *In the Interest of S. O. C.*, 332 Ga. App. at 744 (2). See also *In the Interest of A. S.*, 339 Ga. App. 875, 880 (2) (794 SE2d 672) (2016) (juvenile court entitled to weigh mother's credibility).

The mother also argues that the juvenile court should have given more or less weight to the testimony of certain witnesses. However, this argument is without merit. "On appeal, this Court neither weighs evidence nor determines the credibility of

15

witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." *In the Interest of A. A.*, 252 Ga. App. 167, 169 (2) (555 SE2d 827) (2001).

(b) The record also supports the juvenile court's findings that the dependency was likely to continue. At the time of the hearing, the mother had only very recently moved into her boyfriend's mother's home and refused to provide any information about their relationship or their intentions. Because the mother's housing was completely dependent on her relationship with her boyfriend and her boyfriend's mother, and the mother refused to provide any information about those relationships, her housing could not be considered stable. See *In re A. R.*, 302 Ga. App. 702, 709 (1) (c) (691 SE2d 402) (2010). Moreover, "[l]ast-minute efforts to obtain stable housing, especially those that take place after the termination petition is filed, are of questionable significance and sincerity." (Citation and punctuation omitted.) *In the Interest of P. D. W.*, 296 Ga. App. at 195 (1) (c) (noting this is particularly true where the newly found housing "depends on the continuation of a relationship with a new boyfriend").

The mother also refused to provide proof of her income or her job, which she had only very recently obtained. Juvenile courts are authorized to find that a

16

"parent['s] conduct over the years was a better predictor of [her] future conduct than a few months of partial stability." (Citation and punctuation omitted.) *In the Interest of C. H.*, 305 Ga. App. 549, 561 (2) (c) (700 SE2d 203) (2010). Thus, judging the credibility of the mother's good intentions was a task for the juvenile court. *In the Interest of L. P.*, 339 Ga. App. 651, 655-56 (1) (749 SE2d 252) (2016). See also *In the Interest of M. N. R.*, 282 Ga. App. 46, 47 (637 SE2d 777) (2006) ("The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.") (citation and punctuation omitted).

Finally, in addition to the lack of stable housing and income, given the mother's continued aggression with Department case workers, her refusal to complete all portions of the required psychological evaluation, and her refusal to provide answers to various questions at the hearing, the juvenile court did not err in finding R. S. T.'s dependency is likely to continue. Accordingly, this enumeration of error fails. See *In the Interest of M. S. S.*, 308 Ga. App. 614, 621 (2) (a) (708 SE2d 570) (2011) ("mother's failure to make any significant progress toward achieving the goals of stable employment and stable housing, standing alone, was sufficient to support the juvenile court's finding that the cause of [the child]'s deprivation was likely to continue"). See also *In the Interest of J. J. J.*, 289 Ga. App. 466, 469-70 (657 SE2d

17

588) (2008) (deprivation likely to continue when appellant had medically verifiable deficiency of mental or emotional health, failed to support the child, failed to comply with reunification plan, and failed to establish bond).

2. The mother next asserts, without citation of authority in support, that the trial court erred in admitting Johnson's testimony regarding her bonding evaluation because Johnson relied on hearsay statements and because her opinion went to the ultimate issue of whether termination is in the best interests of R. S. T. We disagree.

Johnson, who was tendered as an expert on child psychology and attachment and bonding without objection, explained that she formed her opinions based on three components: interview, observation, and testing. She also testified that the methods she uses and the information she gathers are of the type regularly used by others in her profession. OCGA § 24-7-703 provides that if the facts or data relied upon by an expert are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." In addition, the testimony of an expert in the form of an opinion is not objectionable on the grounds that it embraces an ultimate issue to be decided by the trier of fact. See OCGA § 24-7-704 (a). Accordingly, this enumeration of error fails.

18

3. The mother also argues that, even if Johnson's testimony was properly admitted, the Department failed to prove that any continuing dependency is likely to cause serious harm to R. S. T. We are constrained to agree.

Pursuant to OCGA § 15-11-311 (a) (5), a juvenile court may only terminate parental rights based on dependency upon finding by clear and convincing evidence that the "continued dependency was likely to cause serious physical, mental, emotional, or moral harm" to the child. In making this determination, the court must assess two scenarios: (1) "the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the deprivation persists" and (2) "whether a child currently in foster care is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care[.]" *In the Interest of A. S.*, 339 Ga. App. at 881 (3). The Department must show that both scenarios would likely cause serious harm in order for a termination of parental rights to be justified. Id. That is because "whether returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo." *In the Interest of E. M. D.*, 339 Ga. App. 189, 201-02 (2) (b) (793 SE2d 489) (2016).

Moreover, "an order terminating parental rights must contain explicit findings supporting the conclusion that continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child." (Citation omitted.) *In the Interest of A. S.*, 339 Ga. App. at 881. Merely reciting the legal standard and that it was met is not sufficient. Id. "Instead, the juvenile court must ascertain the facts and state not only the end result of that inquiry but the process by which it was reached." (Punctuation and citation omitted.) Id.

At the outset of our review, we note that the trial court made no specific finding that continued dependency will cause or is likely to cause serious harm to the child, merely reciting the legal standard without any factual underpinning. We have reversed termination orders on this basis. See *In the Interest of E. M. D.*, 339 Ga. App. at 205 (2) (b) ("In keeping with these requirements of specific findings by clear and convincing evidence of serious harm, we have reversed termination orders unsupported by evidence of particularized findings of harm experienced by the children while in foster care."). However, we exercise our discretion to continue our review to determine whether the record contains clear and convincing evidence that R. S. T.'s continued dependency was likely to cause harm.

Here, under the first scenario, the record supports a finding that R. S. T. would suffer serious harm if she were returned to her mother. Given the mother's lack of stable housing and lack of income, it is likely that she would continue to fail to provide for her child. The mother's ongoing mental health issues, aggression, and violence toward another child also support that R. S. T. would suffer harm if returned to her mother. See *In the Interest of C. L.*, 315 Ga. App. 607, 612 (1) (b) (727 SE2d 163) (2012). But that does not end the inquiry because OCGA § 15-11-311 (a) (5) "requires the State to show that continued dependency – not merely a specific arrangement for the child – will cause harm. Dependency will cause harm only if all of the options available to DFCS short of termination – keeping the child in foster care, or returning the child to the parent – will themselves cause harm." *In the Interest of E. M. D.*, 339 Ga. App. at 201 (2) (b).

Turning to the second scenario, "[i]n considering whether there is evidence that remaining in foster care will cause serious harm to a child, we have examined both (1) the extent to which instability and impermanency are currently causing specific harms to the child and (2) whether the parent's current relationship with the child is itself detrimental." (Citation and punctuation omitted.) *In the Interest of E. M. D.*, 339 Ga. App. at 202 (2) (b). We do not find any evidence in the record, nor did the trial

21

court make any specific factual finding, as to these factors or generally that remaining in foster care would likely cause serious harm to R. S. T.

To the contrary, Johnson, a bonding and attachment expert, and the current case worker testified about the strong and positive relationship R. S. T. has with her foster parents and in particular, Johnson opined that R. S. T. is moving into a stage "at which forming attachments is very critical" and that permanancy is important because "the potential for breaking the attachment that she has to her foster parents will be a problem for her." However, Johnson did not opine that the instability and impermanency of foster care were *currently* causing any specific harm to R. S. T.[9] Moreover, there was no other evidence presented that R. S. T. suffered any emotional stress or sadness from the instability and impermanency associated with foster care. Cf. *In the Interest of E. M. D.*, 339 Ga. App. at 205 (2) (b).

And although Johnson noted that the mother's lack of visitation was a cause for concern because there was only a tenuous bond between R. S. T. and her mother,

_____

[9] We acknowledge that "our Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems." (Citations and punctuation omitted.) *In the Interest of C. L.,* 315 Ga. App. at 612 (1) (b). But there was no evidence presented that R. S. T. was suffering or likely to suffer these types of problems by remaining in foster care at the time of the hearing.

22

she testified that she did not test R. S. T., who was three and a half years old at the time, to see whether she knew her mother or whether she had the cognitive capacity to recognize and remember that her mother had not been visiting her. Thus, there was no evidence that the mother's current relationship with R. S. T., or lack thereof, was adversely affecting R. S. T. Cf. *In the Interest of E. M. D.*, 339 Ga. App. at 202 (2) (b) ("in many of those cases, the evidence also would support a finding that the parent's relationship with the child, or lack thereof, is such that maintaining the status quo of foster care with a continued parental relationship would also be harmful"). Accordingly, we find that the Department has failed to carry its burden to support by clear and convincing evidence that R. S. T. would likely be seriously harmed if she were to remain in foster care.[10]

---

[10] We note that clear and convincing evidence supports the juvenile court's determination that termination of the mother's parental rights would be in R. S. T.'s best interests. See OCGA § 15-11-310 (b) (outlining factors for the juvenile court to decide whether termination is in the child's best interests). This evidence includes Johnson's testimony that R. S. T., who had only seen her mother twice in nine months, was bonded to her foster parents who wished to adopt her and was at a critical stage in forming attachments and developing a secure foundation for her later life. Likewise, the current case manager testified that it was her recommendation that the mother's rights be terminated so that R. S. T. could proceed to adoption because R. S. T. has a very strong relationship with her foster parents, whom she loves and calls "mommy and daddy." And the guardian ad litem also reported, after noting that the mother had cancelled the last scheduled visitation, that adoption by her foster

4. However, although neither party has squarely raised the issue of abandonment on appeal, from our review of the record, it is clear that the Department asserted, albeit cursorily, and the juvenile court agreed, that termination of the mother's parental rights was also proper under OCGA § 15-11-310 (a) (4), which provides that termination of parental rights is authorized when "[a] child is abandoned by his or her parent." OCGA § 15-11-2 (1) defines "abandonment" or "abandoned" to mean "any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims." This intent may be evidenced by:

> (A) Failure, for a period of at least six months, to communicate meaningfully with a child;

> (B) Failure, for a period of at least six months, to maintain regular visitation with a child;

> . . .

> (H) Any other conduct indicating an intent to forgo parental duties or relinquish parental claims.

---

parents was in R. S. T.'s best interests. See *In the Interest of B. D. O.*, 343 Ga. App. at 592 (2) (court permitted to consider recommendations by a court appointed custody evaluator or guardian ad litem in determining best interests of child).

Id. See *In the Interest of B. D. C.*, 256 Ga. 511, 512 (350 SE2d 444) (1986).

Here, the Department claimed in its petition for termination that R. S. T. had been abandoned by her mother and putative biological father. Although the focus of the hearing was on whether the Department satisfied its burden under OCGA § 15-11-310 (a) (5), the Department argued briefly in closing that the mother had abandoned the child. And after reciting its findings of fact, the juvenile court in the conclusory paragraph of the termination order stated:

> The Court further finds that the child remains a dependent child due to lack of proper parental care or control by her parents, reasonable efforts to remedy the circumstances have been unsuccessful, such cause of dependency is likely to continue or will not likely be remedied, and the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to such child as of the date of the hearing on the petition to terminate parental rights. The Court further finds that the child has been abandoned by her parents pursuant to [OCGA] § 15-11-2 and [OCGA] § 15-11-310. It is in the best interest of the child and the public that the proceeding be brought.

Because the court's order is unclear as to which of its factual findings supported its abandonment determination or its erroneous conclusion that termination was warranted due to continued dependency, or both, we vacate the judgment and remand for the juvenile court to clarify its findings such that they can be meaningfully

25

challenged and reviewed on appeal.[11] See *In the Interest of J. A. B.*, 336 Ga. App. 367, 371-72 (785 SE2d 43) (2016) ("These concerns underscore our inability to discern from the juvenile court's order whether the juvenile court found dependency or abandonment as the basis for termination, and until the juvenile court has clarified its determination in this regard, we are unable to properly review the conclusion that termination is in the children's best interests."); *In the Interest of D. T. A.*, 312 Ga. App. 26, 33-34 (1) (d) (717 SE2d 536) (2011) (vacating a juvenile court's termination order and remanding the case for the court to make appropriate findings of fact and conclusions of law to support its judgment). After a new judgment is entered on remand, the losing party shall be free to file another appeal.

*Judgment vacated and case remanded. Ray, Branch, Rickman, and Mercier, JJ., concur. Dillard, C. J., concurs fully and specially. Miller, P. J., and Bethel, J.,*

---

[11] Although this Court does not typically consider issues that are not raised and enumerated as error by an appellant in his or her brief, given the lack of clarity in the juvenile court's order; the fact that abandonment was expressly raised as a grounds for termination by the Department and ruled upon by the court; the gravity of the constitutional concerns in cases involving parental rights; and the juvenile court's imperative to act in the best interests of this child, we are persuaded that we should deviate from our general rule and provide the trial court with an opportunity to clarify its findings regarding abandonment. See *In the Interest of J. A. B.*, 336 Ga. App. at 370 (vacating and remanding for further findings on grounds for termination even though parties focused arguments exclusively on dependency without mentioning abandonment).

*concur fully in Divisions 1, 2 and 4 and concur in judgment only in Division 3.*

*Barnes, P. J., Ellington, P. J., Doyle, P. J., McFadden, P. J., and Andrews, J., dissent.*

*Reese, J., disqualified.*

A17A1595. IN THE INTEREST OF R. S. T., a child.

DILLARD, Chief Judge, concurring fully and specially.

I fully concur with the majority's opinion. But I write separately to further stress the vital importance of Georgia's constitutional and statutory requirement that, before a court can permanently sever a parent-child relationship based on the likelihood of continued dependency under OCGA § 15-11-310 (a) (5), the State must always present *clear and convincing evidence* that continued dependency or maintaining the status quo for a child in foster care poses a risk of serious harm to the child. And here, I agree with the majority that the State failed to satisfy this constitutional and statutory burden. Nevertheless, the State also alleged and the juvenile court found that termination of the mother's parental rights is authorized by OCGA § 15-11-310 (a) (4) because she abandoned R. S. T within the meaning of OCGA § 15-11-2 (1). The court's order, however, is not clear as to which of its factual findings supported its abandonment determination. As a result, and given the gravity of the constitutional protections at issue for both the mother and child, I agree with the majority that the case should be remanded to give the juvenile court an opportunity to clarify what evidence it relied upon when summarily finding that R. S. T. had been abandoned by her mother.

Turning to the issue of parental rights generally, juvenile courts must always be mindful that, regardless of any perceived authority given to them by Georgia's Juvenile Code to interfere with a natural parent's relationship with his or her child, such authority is *only* authorized if it comports with the long-standing, fundamental principle that "[p]arents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children."[1] The liberty interest

---

[1] *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion); *see Meyer v. Nebraska*, 262 U.S. 390, 399 (43 SCt 625, 67 LE2d 1042) (1923) (noting that the "liberty interest guaranteed by the Fourteenth Amendment [to the United States Constitution] includes freedom to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home[,] and *bring up children*, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (punctuation omitted and emphasis supplied)); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) (noting that there is "a private realm of family life which the state cannot enter"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (45 SCt 571, 69 LEd 1070) (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation and citation omitted)); *Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d 769) (1995) ("The U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue

2

parents have in familial relations with their children is a natural-law right that has been enshrined in our positive law.[2] It is a right that preexists government and one that we "retain"[3] as a people separate and apart from any statute or constitution.[4] This

---

state interference."); *see also generally Doe v. Heck,* 327 F3d 492, 517-20 (II) (B) (7th Cir. 2003) (Manion, J.).

[2] *Supra* note 1; *see also* 2 St. George Tucker, Blackstone's Commentaries with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and the Commonwealth of Virginia 446 (Birch & Small 1803) ("The duty of parents to provide for the *maintenance* of their children, is a principle of natural law."); 2 James Kent, Commentaries on American Law 169 (O. Halsted 1827) (noting that "[t]he rights of parents result for their duties [to their children]," and "the law has given them such authority"); John Locke, Second Treatise of Government, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that *parents in societies,* where they themselves are subjects, retain a *power over their children,* and have as much right to their subjection, as those who are in the state of nature."); Hadley Arkes, *The Return of George Sutherland: Restoring a Jurisprudence of Natural Rights* 282-83 (1994) (characterizing the *Meyer* and *Pierce* decisions as containing "the logic of natural rights.").

[3] U.S. CONST. amend IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people");*see also* GA. CONST. amend. 1, § 1, ¶ 29 ("The enumeration of rights herein contained as a part of this Constitution shall not be construed to deny to the people any *inherent* rights which they have hitherto enjoyed.") (emphasis supplied).

[4] *See In the Interest of E. G. L. B.*, 342 Ga. App. 839, 848 (805 SE2d 285) (2017) ("The constitutional right of familial relations is not provided by government; it preexists government. This cherished and sacrosanct right is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable.") (punctuation and citation omitted).

3

is why Georgia's appellate courts have repeatedly emphasized that "the constitutional right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[5] Indeed, as our Supreme Court has rightly noted, "there can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [his or her] offspring."[6] To be sure, the right of familial relations—like any other constitutional right—is not absolute. But when this fundamental liberty interest is at stake, courts must "give full, fair, and thoughtful consideration to the serious matter at hand."[7]

Significantly, the termination of one's parental rights "cannot be equated to an individual who faces an interruption of custody because termination is a much more severe measure that acts to address the most exceptional situation of a deprived child

---

[5] *In the Interest of D. M.*, 339 Ga. App. 46, 52 (793 SE2d 422) (2016) (punctuation omitted); *accord In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of J. V. J.*, 329 Ga. App. 421, 425 (765 SE2d 389) (2014); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006).

[6] *In the Interest of M. F.*, 298 Ga. at 145 (2) (punctuation omitted); *accord Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

[7] *Floyd*, 337 Ga. App. at 479 (1).

4

and that child's continuing deprivation."[8] And there is a reason for this crucial distinction:

> Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations.[9]

As we have repeatedly explained, "there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship[,] [and] . . . 'compelling facts' are required to terminate parental rights."[10]

Guided by these overarching constitutional principles, this Court recently addressed, yet again, OCGA § 15-11-310 (a) (5)'s requirement that, before parental rights can be terminated, the State must present clear and convincing evidence that a child's "continued dependency was likely to cause serious physical, mental,

---

[8] *In the Interest of S. O. C.*, 332 Ga. App. at 742 (punctuation omitted); *accord In the Interest of D. M.*, 339 Ga. App. at 51; *In the Interest of C. J. V.*, 323 Ga. App. at 292 (Dillard, J., concurring fully and specially).

[9] *In the Interest of S. O. C.*, 332 Ga. App. at 742-43; *accord In the Interest of D. M.*, 339 Ga. App. at 51; *In the Interest of C. J. V.*, 323 Ga. App. at 292 (Dillard, J., concurring fully and specially).

[10] *In the Interest of S. O. C.*, 332 Ga. App. at 743 (punctuation and footnotes omitted); *accord In the Interest of D. M.*, 339 Ga. App. at 51; *In the Interest of J. V. J.*, 329 Ga. App. at 425.

5

emotional, or moral harm."[11] In this regard, our law requires a juvenile court to "consider both the relationship between the parent and child at the time of the termination hearing and what might happen if the child were returned to the parent."[12] As detailed by the majority, the evidence presented here leaves little doubt that returning R. S. T. to her mother's custody at this time presents a substantial likelihood of harm as defined by OCGA § 15-11-310 (a) (5), and the juvenile court made detailed factual findings to support its conclusion in this regard. But given the constitutional protections set forth *supra*, this does not end our inquiry. The State was also required to prove—by clear and convincing evidence—that R. S. T., who is "currently in foster care[,] is likely to suffer serious harm as a result of continued dependency if the child remains indefinitely in foster care."[13] This is because whether

---

[11] *In the Interest of A. S.*, 339 Ga. App. 875, 880-81 (3) (794 SE2d 672, 677 (2016); *see In the Interest of E. M. D.*, 339 Ga. App. 189, 200 (II) (B) (793 SE2d 489) (2016) (noting that "OCGA § 15-11-310 (a) (5) demands that the juvenile court terminate parental rights based on dependency only upon finding by clear and convincing evidence that the continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child in question" (punctuation omitted)).

[12] *In the Interest of A. S.*, 339 Ga. App. at 881 (3); *accord In the Interest of E. M. D.*, 339 Ga. App. at 201 (II) (B).

[13] *In the Interest of A. S.*, 339 Ga. App. at 881 (3); *see In the Interest of E. M. D.*, 339 Ga. App. at 201 (II) (B) ("Dependency will cause harm only if all of the options available to DFCS short of termination—keeping the child in foster care, or

6

"returning the child to the parent would cause harm matters little if there is no evidence that the child is likely to experience serious harm under the status quo."[14] And having this standard as part of our inquiry in OCGA § 15-11-310 (a) (5) cases is crucial to safeguarding the sacrosanct right of familial relations. It preserves and cultivates the natural parent-child relationship even when circumstances are such that a parent is presently (or perhaps even permanently) incapable of independently caring for his or her child. Thus, if a child is thriving in foster care and remains bonded to a biological parent, the State is without authority to extinguish that constitutionally protected relationship. In order to do so, the State must satisfy its statutory and constitutional burden under OCGA § 15-11-310 (a) (5) of demonstrating by clear and convincing evidence that the child remaining in foster care poses a risk of serious harm to the child.[15] This is so even in cases like the one before us, where the

returning the child to the parent—will themselves cause harm. Thus, it follows logically that the potential harm of both options should be considered.").

[14] *In the Interest of E. M. D.*, 339 Ga. App. at 201-02 (II) (B); *accord In the Interest of L. P.*, 339 Ga. App. 651, 657 (2) (794 SE2d 252) (2016).

[15] *See Blackburn v. Blackburn,* 249 Ga. 689, 692 (2) (292 SE2d 821) (1982) (acknowledging that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the United States Constitution," and that "the Due Process Clause of the Fourteenth Amendment demands that before a state may sever the rights of parents in their natural child, the state must support its allegations by at least clear and convincing evidence" (cleaned up)).

biological parent's relationship with her child is virtually nonexistent. We recognize, of course, that it can undoubtedly be challenging for the State to meet this burden when dealing with a parent who refuses to cooperate in being reunited with her child. How do you demonstrate that a young child is being harmed in foster care when she is happy and unaware of her mother's regrettable behavior? That cannot be an easy task. But this is the exact case before us. And the problem, as I see it, is that OCGA § 15-11-310 (a) (5) is a strained vehicle for terminating this mother's constitutional right of familial relations. In my view, this is a classic abandonment case, and the State and juvenile court will have another opportunity on remand to reconsider whether this natural parent-child relationship should continue in that context.

In any event, we are right, as we have to done in the past, to reverse a termination order due to a lack of evidence that "the children would experience serious harm if they remained in foster care, even when the State did show that the return of the child to the parent might well cause harm."[16] And here, I agree with the

---

[16] *In the Interest of E. M. D.*, 339 Ga. App. at 202 (II) (B); *see In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (reversing a termination order and noting that "the mother's inability to care for her children does not necessarily mean that her current relationship with them is detrimental" (citations and punctuation omitted)); *In the Interest of A. T.*, 271 Ga. App. 470, 473 (610 SE2d 121) (2005) (same); *In the Interest of D. F.*, 251 Ga. App. 859, 861-62 (555 SE2d 225) (2001) (reversing termination where mother could not care for children, because

8

majority that the State failed to present any evidence that R. S. T. is likely to experience serious harm if she were to remain in foster care indefinitely. Indeed, while there is substantial evidence that the mother is presently unable to care for R. S. T., the record is devoid of any testimony or other evidence suggesting that there would be "any adverse effect on [R. S. T.] by [her] remaining in foster care as opposed to [her] being permanently adopted."[17] To the contrary, the evidence detailed by the majority shows that R. S. T. is bonded with her foster parents and thriving in foster care. The clinical psychologist, who performed the bonding assessment of R. S. T. and her foster parents, testified only generally about the need for children R. S. T.'s age to form "secure attachments." And she further testified that R. S. T. is attached to her foster parents, that her foster parents are able to provide a safety net and source of support, that R. S. T. has a need for permanency (generally speaking), and that disrupting her attachment to her foster parents could potentially cause an array of emotional problems. As to any risk factors of R. S. T. being disrupted in her

---

State did not meet evidentiary burden to show harm from continuing foster care status quo).

[17] *In the Interest of S. O. C.*, 332 Ga. App. at 746 (3) (punctuation omitted); *accord In the Interest of A. T.*, 271 Ga. App. at 473.

9

current foster placement, the psychologist testified that she did not assess such factors *within the context of evaluating R. S. T. specifically*. This will not do.

As we have previously emphasized, a juvenile court cannot terminate parental rights when a child is thriving in foster care simply based on "generalized concerns of doubt, uncertainty, hesitancy in life, and the need for stability and permanence."[18] Suffice it to say, the very fact that a child is thriving in foster care weighs heavily against a finding that the child is likely to suffer harm by maintaining the status quo.[19]

---

[18] *In the Interest of D. M.*, 339 Ga. App. at55 (2) (a); *see In the Interest of C. J. V.*, 323 Ga. App. at 291-92 (Dillard, J., concurring fully and specially) ("[W]hile I do not quibble with the general proposition that children need permanency (or, for that matter, the corollary that long-term foster care can have ill effects), I find it troubling that many of our prior decisions upholding the termination of parental rights appear to rely, in part, on such generalizations without specifically tying them to particularized findings of fact, even though we have repeatedly held that a juvenile court is required to make explicit findings of fact that the child at issue—rather than some hypothetical child placed in the subject child's situation—will suffer or is likely to suffer serious harm as a result of the continued deprivation.").

[19] *See In the Interest of S. O. C.*, 332 Ga. App. at 746 (3) ("[W]hile we certainly acknowledge and appreciate that [the child] is thriving in his foster home, as well as the commendable care the foster parents are providing the child, the juvenile court has no authority to sever the natural parent-child relationship simply because it believes the child would be better off with the foster family." (punctuation omitted)); *accord In the Interest of J. V. J.*, 329 Ga. App. at 428; *see also In the Interest of C. J. V.*, 323 Ga. App. at 291 (Dillard, J., concurring fully and specially) ("And while it is certainly heartening to know that the children are thriving in their foster home, the State has no business facilitating the adoption of children entrusted to its care until and unless a parent has, by her actions or inaction, forfeited her constitutional right

10

And while Presiding Judge Barnes contends in her dissent that requiring the State to present such evidence regarding a child's continued placement in foster care "creates a *de facto* requirement that a child exhibit psychological or physical harm before parental rights can be severed," this is simply not the case. As explained by the majority, the State can satisfy OCGA § 15-11-310 (a) (5) by presenting evidence that, as to the *specific child at issue*, there is a *likelihood* that the child would suffer such harm if he or she remains in foster care, and such a showing can be preemptively made before any such future harm occurs. And in this particular case, the State presented only *generalized* testimony regarding the importance of permanency and attachment for young children, rather than offering evidence specific as to R. S. T.

That said, as the majority rightly notes, OCGA § 15-11-310 (a) (5) was not the only ground for termination raised by the State and ruled upon by the juvenile court. Specifically, in its petition seeking to terminate the mother's parental rights, after detailing all of the evidence that it alleged supported the petition, the State claimed that R. S. T. had been abandoned by her mother and putative biological father. Then, during the termination hearing, the State argued that the evidence presented satisfied

---

to familial relations. The State's primary goal must be to maintain and preserve the natural parent-child relationship . . . .").

11

the statutory definition of abandonment, which is an alternative ground for termination that does *not* require the State to prove that R. S. T. is likely to suffer harm if she remains indefinitely in foster care.[20] In its order, after making extensive factual findings, the juvenile court agreed.

OCGA § 15-11-310 (a) (4) provides that termination of parental rights is authorized when "[a] child is abandoned by his or her parent." And OCGA § 15-11-2 (1) defines "abandonment" or "abandoned" to mean "any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims." The statute further provides numerous examples of such conduct, some of which would certainly seem to comport with the evidence presented in this case.[21] Of course, in considering *any* ground for terminating parental rights, including abandonment, a juvenile court must consider the overarching constitutional principle that termination is unauthorized "unless a parent has, by her actions or

---

[20] *See* OCGA § 15-11-310 (a) (4).

[21] *See* OCGA § 15-11-2 (1) (A)-(H) (detailing conduct that evinces's a parent's intent to abandon his or her child, which includes, but is not limited to, the failure, for a period of at least six months, to communicate meaningfully with the child, maintain regular visitation with the child, leave the child with another person without provision for his or her support, or to participate in any court ordered plan or program designed to reunite the parent and child).

12

inaction, forfeited her constitutional right to familial relations."[22] Here, because termination of the mother's parental rights may be justified on the ground of abandonment, I agree with the majority that it is appropriate to remand this case to provide the juvenile court with an opportunity to clarify its findings in this regard.[23]

---

[22] *In the Interest of C. J. V.*, 323 Ga. App. at 291 (Dillard, J., concurring fully and specially); *see In the Interest of E. G.*, 315 Ga. App. 35, 48 (726 SE2d 510) (2012) (Dillard, J., concurring fully and specially) ("[I]t is one thing if a parent desires to care for his or her child but simply lacks the financial wherewithal or emotional capability to do so but quite another for a parent to willfully disregard or abandon his or her parental duties."); *In the Interest of A. E. S.*, 310 Ga. App. 667, 671 (714 SE2d 148) (2011) (Dillard, J., concurring specially) (same); *In the Interest of J. E.*, 309 Ga. App. 51, 61 (711 SE2d 5) (2011) (Dillard, J., dissenting) ("The overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back into custody, but is instead whether the natural parent-child relationship has been irretrievably damaged as a result of the parent's unwillingness or inability to care for the child—i.e., that the continuation of the natural parent-child relationship, as it *presently* exists with the child in the custody of the State, is causing or is likely to cause that child serious harm.").

[23] *See In the Interest of J. A. B.*, 336 Ga. App. 367, 371-72 (785 SE2d 43) (2016) (vacating a termination order and remanding the case for the juvenile court with direction to more fully develop the statutory ground or grounds for termination and the factual findings supporting its decision "when it was unclear whether the juvenile court found the basis for termination to be dependency or abandonment); *In the Interest of D. T. A.*, 312 Ga. App. 26, 33-34 (1) (d) (717 SE2d 536) (2011) (vacating a juvenile court's termination order and remanding the case for the court to make appropriate findings of fact and conclusions of law to support its judgment); *see also Dell v. Dell*, 324 Ga. App. 297, 301-02 (1) (748 SE2d 703) (2013) (physical precedent only) (vacating a juvenile court's termination order and remanding the case for the court to make specific findings to support its determination that the child had

13

I am authorized to state that Judges Ray and Branch join in this concurrence.

---

been abandoned and that termination was in the best interest of the child).

14

A17A1595. IN THE INTEREST OF R. S. T., a child.

BARNES, Presiding Judge, dissenting.

The minor child R. S. T. has lingered in foster care for four years while her biological mother, who suffers from severe mental illness and cognitive deficits, has repeatedly rejected resources and thwarted attempts to facilitate a parental relationship with her child by cutting off visitation for an extended period and engaging in a pattern of belligerent and aggressive behavior toward others, including every case manager assigned to the case. The mother also has directed her erratic and belligerent behavior toward her own children during visitation and exhibited the same behavior during the termination hearing itself. While the biological mother has consistently undermined efforts aimed at building a relationship with her child, R. S. T. has bonded with her foster parents and refers to them as her mom and dad, and they wish to adopt her. Under these circumstances, there was clear and convincing evidence to support the juvenile court's finding that continued dependency was likely to cause serious physical, mental, emotional, or moral harm to the child and to terminate the mother's parental rights. Additionally, there was clear and convincing evidence to support the juvenile court's finding that the mother had abandoned R. S. T. and to terminate her parental rights on that alternative statutory basis.

Accordingly, I would affirm the juvenile court's termination order and therefore respectfully dissent.[1]

"[O]n appeal from a termination order, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated." (Footnote and punctuation omitted.) *In the Interest of S. O. C.*, 332 Ga. App. 738, 741-742 (774 SE2d 785) (2015). "[W]e neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened." (Citations and punctuation omitted.) *In the Interest of S. C. S.*, 336 Ga. App. 236, 245 (784 SE2d 83) (2016).

1. OCGA § 15-11-310 (a) (5) provides that in considering the termination of parental rights, a juvenile court must determine, among other things, whether the

---

[1] I agree with the majority that the record supports the juvenile court's findings that R. S. T. was dependent due to a lack of proper parental care and control, that the dependency was likely to continue, and that termination of the mother's parental rights would be in R. S. T.'s best interests. I also agree with the majority that the juvenile court did not err in admitting the child psychology expert's testimony regarding the bonding evaluation.

2

"continued dependency [is] likely to cause serious physical, mental, emotional, or moral harm" to the child. In making this determination, "the court must consider not only the likelihood of harm if the child remains indefinitely in foster care, but also the likelihood of harm if the child returns to the custody of [her] parent, notwithstanding that the deprivation persists." *In the Interest of C. L.*, 315 Ga. App. 607, 611-612 (1) (d) (727 SE2d 163) (2012) (whole court). As we have noted, "however, the same facts authorizing a finding that deprivation is likely to continue may also authorize a finding, under the circumstances of an individual case, that the continued deprivation is likely to cause serious harm." (Emphasis omitted.) *In the Interest of J. E.*, 309 Ga. App. 51, 57 (1) (d) (711 SE2d 5) (2011) (whole court). Furthermore, evidence that the child would likely suffer serious harm if returned to the parent also may "support a finding that the parent's relationship with the child, or lack thereof, is such that maintaining the status quo of foster care with a continued parental relationship would also be harmful." *In the Interest of E. M. D.*, 339 Ga. App. 189, 202 (2) (b) (793 SE2d 489) (2016).

The majority concludes in Division 3 of its opinion that while the record supports a finding that R. S. T. would likely suffer serious harm if she were returned to her mother, it does not support a finding that remaining in foster care would likely

3

cause her serious harm. According to the majority, there was not clear and convincing evidence to support a finding that continued dependency will cause or is likely to cause serious physical, mental, emotional, or moral harm to R. S. T. under OCGA § 15-11-310 (a) (5).[2]

However, the same evidence reflecting that R. S. T. would likely suffer serious harm if returned to her mother also supports a finding that prolonging the parental relationship while the child remains in foster care would likely cause her serious harm. As we have indicated in our precedent, evidence that the parent suffers from profound mental health problems, combined with aggressive or violent behavior, is sufficient to support a finding that continued dependency will likely cause serious

---

[2] The majority also concludes that the juvenile court merely recited the legal standard that continued dependency will cause or is likely to cause serious harm to the child "without any factual underpinning." But, the juvenile court's termination order contained several pages of factual findings regarding the mother, including findings about the mother's ongoing, severe mental health problems and her unresolved pattern of angry and aggressive behavior toward others. The juvenile court's order further stated that the conclusions of law (which included the determination that continued dependency would cause or likely would cause serious harm to R. S. T.) were based on the court's findings of fact. The juvenile court's written findings therefore were sufficient. See, e.g., *Ray v. Denton*, 278 Ga. App. 69, 72-73 (2) (628 SE2d 180) (2006) (holding that juvenile court's written findings were sufficient, where court's order terminating parental rights set out specific findings of fact and then "stated that its conclusions of law were based on its findings of fact and the verified petition").

harm to the child under OCGA § 15-11-310 (a) (5).  See *In the Interest of O. B.*, 337 Ga. App. 401, 404 (1) (787 SE2d 344) (2016); *In the Interest of E.G.*, 284 Ga. App. 524, 529 (1) (d) (644 SE2d 339) (2007); *In the Interest of C. L. C.*, 277 Ga. App. 297, 302 (1) (d) (626 SE2d 531) (2006); *In the Interest of D. L.*, 270 Ga. App. 847, 847-849 (608 SE2d 311) (2004).  As we have explained, the aggressive or violent behavior of the parent towards others would authorize a juvenile court "to find that a clear potential exists that the [parent]'s demonstrated tendency toward violence could be directed toward the children in the future." *In the Interest of D. T. A.*, 318 Ga. App. 182, 184 (1) (733 SE2d 466) (2012).

That is the situation here.  The record, viewed in favor of the juvenile court's ruling, reflects that the mother has ongoing, profound mental health problems and has been diagnosed by various therapists with anxiety disorder, depressive disorder, substance abuse, bipolar disorder, psychotic disorder, and a personality disorder. Moreover, the mother's scores on a test administered by one of the State's expert psychologists were consistent with someone who exhibits a pattern of antisocial and high-risk behavior. The mother's cognitive test scores placed her in the second percentile of the range for intellectual functioning, and she was previously diagnosed with mental retardation. According to the State's expert psychologist, the mother has

5

a lack of acknowledgment and insight regarding her mental issues, she does not have the cognitive resources necessary to care for a child, and she "lacks a basic understanding of what it takes to provide parenting at a minimally acceptable basic level." Moreover, the mother refused to see the mental health providers recommended for her treatment by the Department of Children and Family Services (the "Department"), and she has not consistently taken her prescribed medication for her mental health problems.

Additionally, there was extensive evidence of the mother's belligerent and aggressive behavior towards other people, including the State's expert psychologist and all of the Department case managers assigned to the matter. A prior order entered in March 2015 of which the juvenile court took judicial notice also reflected that two witnesses had observed the mother repeatedly cursing and screaming at her children and kneeing and shoving one of her other children during visitation. Moreover, the evidence of the mother's mental health issues and aggressive behavior was buttressed by the mother's own erratic and belligerent conduct in the courtroom during the termination hearing, which included the mother walking out of the courtroom on several occasions when she was unhappy with the testimony, refusing to answer certain questions on direct and cross-examination, and walking off the witness stand

during the middle of her testimony, leading to the intervention of a courtroom deputy. See *In the Interest of K. C. W.*, 297 Ga. App. 714, 719 (2) (b) (678 SE2d 343) (2009) (juvenile court's finding that father was mentally deficient was "buttressed by the court's own observations of the father's testimony and demeanor at the termination hearing"); *In the Interest of A. M. L.*, 242 Ga. App. 121, 123 (1) (c) (527 SE2d 614) (2000) (mother's courtroom demeanor and behavior "demonstrated ongoing mental problems").

This evidence of the mother's profound mental illness and cognitive deficits, combined with her longstanding pattern of belligerent and aggressive behavior towards others (including Department case managers and her children during visitation), was sufficient to show that continued foster care with an ongoing parental relationship would likely cause serious harm to R. S. T. See *In the Interest of O. B.*, 337 Ga. App. at 404 (1); *In the Interest of E.G.*, 284 Ga. App. at 529 (1) (d); *In the Interest of C. L. C.*, 277 Ga. App. at 302 (1) (d); *In the Interest of D. L.*, 270 Ga. App. at 847-849. However, even if we were to assume that the mother's mental problems and aggressive behavior were insufficient to show that remaining in foster care with continued visitation would likely result in serious harm to R. S. T., there was additional evidence presented that supported such a determination.

7

"[O]ur Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems." (Citations and punctuation omitted.) *In the Interest of C. L.*, 315 Ga. App. 607, 612 (1) (b) (727 SE2d 163) (2012) (whole court). Here, the record reflects that R. S. T., almost four years old by the time of the termination hearing, was removed from the mother's care shortly after her birth and remained in foster care over the ensuing years, except for a few weeks when the mother had temporary custody of the child before the child was removed again from her care. The mother reduced her amount of visitation with R. S. T. in September 2013 and then refused to visit the child altogether from June 2015 to March 2016, which raised concerns about her bond with the child, according to the State's expert psychologist.

Moreover, the State's child psychologist with an expertise in attachment and bonding testified that R. S. T. had a secure attachment[3] with the foster parents who wish to adopt her, referring to them as her mom and dad, and she opined that

_____

[3]According to the child psychologist, "secure attachment" means that R. S. T. "sees [her foster parents] as a secure base, that they will be able to meet her needs and be her safety net and be her source of support." The adoption case manager assigned to the case in November 2015 also testified that the child has a strong relationship with her foster parents, loves them, and calls them mommy and daddy.

8

visitation is important to maintain a bond between a parent and child. The child psychologist further testified that between the ages of approximately 18 months and 4 years (R. S. T. was 3 years 9 months old on the date of the juvenile court's termination order),

> [d]isrupting an attachment can cause trauma, and children generally will react to that in terms of depression, feelings of hopelessness. They sort of go through those stages or grief. First is protest, second is anger. Then depression, then acceptance. And it's a traumatic process for them to break an attachment at this age.

The child psychologist further opined that

> were a child of this age to be removed, I think the potential and the research has supported that there are greater incidents of juvenile delinquency, disruptive attachment in forming friendships, disruptive attachment in forming, or disruptions in forming attachments to further figures in adult relationships. Potential for depression, potential for anxiety, and diminished coping skills.

According to the child psychologist, if R. S. T. "doesn't have permanency then the potential for breaking the attachment she has to her foster parents will be a problem for her."

In light of this record, there was clear and convincing evidence that remaining in foster care likely would seriously harm R. S. T., and thus sufficient evidence for

9

the juvenile court to find that continued dependency will cause or is likely to cause the child to experience serious physical, mental, emotional, or moral harm under OCGA § 15-11-310 (a) (5). See *In the Interest of T. A. H.*, 310 Ga. App. 93, 97 (3) (712 SE2d 115) (2011) (evidence of bond between children and foster parent who wished to adopt them, plus evidence that children had been in foster care for most of their lives and had been harmed when in the custody of their mother, was sufficient to support a finding that continued deprivation was likely to seriously harm the children, given that courts are "authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care") (citation and punctuation omitted). See also *In the Interest of D. T. A.*, 318 Ga. App. at 184 (1) (evidence of mother's anger issues and violent tendencies and failure to fully comply with case reunification plan, combined with fact that she "had not been able to maintain a meaningful and consistent bond with [her] children" and the "well-established principle that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems," was sufficient to support finding that continued deprivation would likely cause serious harm to her children) (citation and punctuation omitted).

Our law does not require that the child suffer actual harm in foster care before the State is permitted to intercede and terminate a dangerous parent-child relationship, and this Court should not place an evidentiary burden on the State so high that it creates a *de facto* requirement that a child exhibit psychological or physical harm before parental rights can be severed. See *In the Interest of A. S. H.*, 239 Ga. App. 565, 571 (1) (521 SE2d 604) (1999) (juvenile court "is not obligated to . . . wait until the children *actually* have been harmed before terminating the parent's rights") (emphasis in original). As our General Assembly has emphasized, one of the purposes of the Juvenile Code is "[t]o eliminate the need for a child who has been adjudicated as a dependent child to wait unreasonable periods of time for his or her parent to correct the conditions which prevent his or her return to the family." OCGA § 15-11-260 (a) (2). To have R. S. T. continue unnecessarily and indefinitely in foster care when she could be adopted by her foster parents contravenes that clear legislative purpose. I therefore would affirm the juvenile court because there was sufficient evidence to support the court's finding and judgment that all of the factors for terminating the mother's parental rights under OCGA § 15-11-310 (a) (5) (including the requirement of continued dependency likely causing serious harm to the child)

11

were satisfied in this case, and sufficient evidence that termination was in the best interest of the child pursuant to OCGA § 15-11-310 (b).[4]

2. The juvenile court's termination order also should be affirmed based on the court's finding of abandonment, which is supported by clear and convincing evidence in the record.

OCGA § 15-11-310 (a) provides that "[i]n considering the termination of parental rights, the court shall first determine whether one of the statutory grounds for termination has been met[, including that] (4) [a] child is abandoned by his or her parent[.]" Abandonment is defined in the Juvenile Code in OCGA § 15-11-2 (1), which provides in pertinent part that

> "[a]bandonment" or "abandoned" means any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims. Intent to forgo parental duties or relinquish parental claims may be evidenced by: (A) Failure, for a period of at least six months, to communicate meaningfully with a child; (B)

---

[4] See supra footnote 1. The same factors discussed in the majority opinion and this dissent that show the mother's parental misconduct and inability – combined with the fact that the foster parents wish to adopt R. S. T. and the guardian ad litem's opinion that adoption would be in the child's best interest – also support a finding that termination of the mother's parental rights would be in the best interest of the child. See *In the Interest of B. D. O.*, 343 Ga. App. 587, 592 (2) (807 SE2d 507) (2017); *In the Interest of B. J. F.*, 276 Ga. App. 437, 443 (2) (623 SE2d 547) (2005).

Failure, for a period of at least six months, to maintain regular visitation with a child; (C) Leaving a child with another person without provision for his or her support for a period of at least six months; (D) Failure, for a period of at least six months, to participate in any court ordered plan or program designed to reunite a child's parent, guardian, or legal custodian with his or her child; . . . or (H) Any other conduct indicating an intent to forgo parental duties or relinquish parental claims.

Here, the State argued in the juvenile court that the mother had abandoned R. S. T., and in addition to finding that the standard for termination under OCGA § 15-11-310 (a) (5) had been met, the court "further [found] that the child ha[d] been abandoned by [the mother] pursuant to [OCGA] § 15-11-2 and [OCGA] § 15-11-310."[5] Specifically, the juvenile court found that

[t]he mother has failed to develop and maintain a parental bond with the child in a meaningful, supportive manner for a period in excess of six months prior to the hearing on the petition for termination of parental rights.

---

[5] Given the specific language in the termination order reflecting that the juvenile court "further" found that the evidence supported a finding of abandonment, it is clear that the court intended to find both abandonment and dependency as a statutory ground for termination. Hence, the present case is unlike *In the Interest of J. A. B.*, 336 Ga. App. 367, 370 (785 SE2d 43) (2016), where we could not "determine from the juvenile court's order whether it intended to find abandonment, dependency, or both as the statutory ground for termination."

13

The mother has without justifiable cause failed to provide for the care and support of the child as required by law for a period in excess of six months prior to the hearing on the petition for termination of parental rights[; and]

The mother has without justifiable cause failed to comply with a court ordered plan designed to reunite the child with the mother for a period in excess of six months prior to the hearing on the petition for termination of parental rights.

The juvenile court further found that

[t]he mother declined supervised visitation with the child for several months beginning in May 2015. The mother has seen the child once in the last eight (8) months, in March 2016. The Department offered supervised visitation with the mother and the child at the Department's office, which the mother declined. The mother testified that she sought to re-engage visitation in January 2016, but was unable to visit until March 8, 2016[,] because the offered location at the Department's office was inconvenient. Once the visits changed location to the courthouse, the mother did visit one (1) time with the child.

As an initial matter, the mother has failed to enumerate as error and challenge on appeal the juvenile court's determination that the evidence supported a finding of abandonment by the mother as a statutory ground for terminating her parental rights. Therefore, the mother has waived on appeal her right to challenge the juvenile court's

14

finding as to this ground. See, e.g., *In the Interest of E. G. M.*, 341 Ga. App. 33, 49 (2) (a) (798 SE2d 639) (2017); *In the Interest of B. M. L.*, 239 Ga. App. 511, 512 (521 SE2d 448) (1999). Cf. *Hewitt v. Community & Southern Bank*, 324 Ga. App. 713, 716 (2) (751 SE2d 513) (2013) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment.") (citation and punctuation omitted); *Marks v. State*, 280 Ga. 70, 75 (4) (623 SE2d 504) (2005) (holding that failure to enumerate on appeal a ruling as error will result in waiver of the claim). Nevertheless, the juvenile court's findings in support of termination based on abandonment of the child, OCGA § 15-11-310 (a) (4), are supported by the record.

The Department's case manager from October 2012 to May 2015 testified that the mother had not provided any financial support for the child since the child entered foster care, and despite the case manager's attempts to talk to the mother about paying child support, the mother stated a number of times that she was not going to pay it. The case manager also confirmed that other than a few weeks in late 2013, the child has never lived with the mother.

The Department's case manager from May 2015 to November 2015 when the case was assigned to adoption testified that the mother did not visit with the child between May 2015 and November 2015. Despite the case manager speaking with the mother about visitation and providing her with a MARTA card to facilitate transportation in the month of July 2015,[6] the mother consistently refused visitation because it was supervised. The case manager further testified that while she was the case manager the mother paid no child support, nor did she send any cards, gifts, or letters to the child.

An adoption case manager was assigned to the case in November 2015. She testified that the mother made no visits to see the child in November or December 2015; that the mother did not visit the child for Christmas and did not send any cards, gifts, or letters during that time. The mother also admitted to continued marijuana use. The adoption case manager confirmed that the mother did not visit the child again in January or February 2016 but did schedule a visit for March 8, 2016, and every other Tuesday thereafter. Nevertheless, after the lone visit on March 8, the mother did not

---

[6] The case manager did not provide any additional MARTA cards because the mother was not complying with services and refusing to participate in a psychological parental fitness evaluation through a Department provider.

16

exercise any other visits with the child. The adoption case manager also confirmed that the mother paid no child support.

While the mother claimed to have spoken briefly to R. S. T. on the child's birthday and to have given her gifts at Christmas, the mother admitted that she only visited with the child one time because she wanted visitation changed to unsupervised visitation. Finally, the mother's licensed professional counselor testified that she was aware that the mother had stopped visiting with the child after May 9, 2015, and counseled her against it, but the mother did not heed her advice.

Accordingly, I would affirm the juvenile court's order terminating the mother's parental rights on the additional ground that the record supports the juvenile court's findings and conclusion that the Department established grounds for termination based on the mother's abandonment of R. S. T. pursuant to OCGA § 15-11-310 (a) (4)[7] and sufficient evidence to support the juvenile court's conclusion that termination

---

[7] See *In the Interest of B. D. O.*, 343 Ga. App. 587, 590-591 (1) (807 SE2d 507) (2017) (upholding a termination for abandonment because evidence showed the father had not paid child support, had not seen the child for a year, had failed to legitimate the child, had moved without consulting the Department, and had failed to attend the vast majority of scheduled visits with the child). We note that *In the Interest of L. S.*, 244 Ga. App. 626, 627 (1) (536 SE2d 533) (2000), which is cited by this Court in *In the Interest of B. D. O.*, contains a citation to prior case law in which this Court stated that "[i]n order to find an abandonment, there must be sufficient evidence of an actual desertion, accompanied by an intention to sever entirely, so far as possible to do so,

17

was in the best interest of the child pursuant to OCGA § 15-11-310 (b). I therefore respectfully dissent to the majority's decision in this case.

I am authorized to state that Presiding Judge Doyle, Presiding Judge Ellington, and Judge Andrews join in this dissent.

---

the parental relation, throw off all obligations growing out of the same, and forego all parental duties and claims." As this Court noted in *In the Interest of A.W.*, 240 Ga. App. 259, 262 n.4 (523 SE2d 88) (1999), that language was based on cases construing "the former OCGA § 15-11-51 (a) (1), which was repealed in 1986."

A17A1595. IN THE INTEREST OF R. S. T., a child.

DOYLE, Presiding Judge, dissenting.

Although I agree with all that is said in Judge Barnes's dissent and her recitation of the burden of proof to establish the statutory ground for termination under OCGA § 15-11-310 (a) (5),[1] I write separately to emphasize that we need not

---

[1] The majority finds that there is insufficient evidence for the juvenile court to have found that "continued dependency was likely to cause serious physical, mental, emotional, or moral harm" to the child because of its reliance on *In the Interest of A. S.*, 339 Ga. App. 875, 880-882 (3) (794 SE2d 672) (2016), and *In the Interest of E. M. D.*, 339 Ga. App. at 189, 202 (2) (b) (793 SE2d 489) (2016), which require a showing that "there is evidence that remaining in foster care will cause serious harm to a child [based on evidence that] (1) . . . instability and impermanency are currently causing specific harms to the child and (2) . . . the parent's current relationship with the child is itself detrimental." Majority Division 3, supra, quoting *In the Interest of E. M. D.*, 339 Ga. App. at 202 (2) (b). Nevertheless, I question this language because the statute does not require a juvenile court to make any specific inquiries to determine whether continued dependency is likely to cause serious harm. These two cases and related cases that require similar applications of this new standard deviate from longstanding precedent, which was most aptly summarized by now Justice Blackwell in *In the Interest of C. L.*, 315 Ga. App. 607, 612-613 (1) (b) (727 SE2d 163) (2012) (whole court). There, this Court explained that

> our Court has recognized, in case after case, that children should not be required to linger unnecessarily and indefinitely in foster care, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems. [*In the Interest of*] *J. E.*, 309 Ga. App. at [51,] 58 (1) (d) [(711 SE2d 5) (2011)] (citation and punctuation omitted); see also *In the Interest of T. H.*, 311 Ga. App. 641,

address this issue because the mother did not appeal the alternative ground for termination — abandonment under OCGA §15-11-310 (a) (4) — expressly ruled on by the trial court.[2] The mother's failure to appeal that ruling renders her bound by the

645 (716 SE2d 724) (2011); *In the Interest of R. J. D. B.*, 305 Ga. App. 888, 895 (1) (b) (700 SE2d 898) (2010); *In the Interest of A. R.*, 302 Ga. App. 702, 711 (1) (d) (691 SE2d 402) (2010); *In the Interest of A. J. D. S.*, 300 Ga. App. 235, 239 (4) (684 SE2d 360) (2009); *In the Interest of S. N. H.*, 300 Ga. App. 321, 327 (1) (d) (685 SE2d 290) (2009); *In the Interest of K. R.*, 298 Ga. App. 436, 442 (1) (d) (680 SE2d 532) (2009); *In the Interest of P. D. W.*, 296 Ga. App. 189, 196 (1) (d) (674 SE2d 338) (2009); *In the Interest of D. W.*, 294 Ga. App. 89, 93 (1) (d) (668 SE2d 533) (2008); *In the Interest of C. J. L. C.*, 293 Ga. App. 848, 852 (1) (c) (668 SE2d 821) (2008); *In the Interest of J. L. C.*, 292 Ga. App. 763, 768 (666 SE2d 98) (2008); *In the Interest of D. B. C.*, 292 Ga. App. 487, 496 (1) (d) (664 SE2d 848) (2008); *In the Interest of J. S.*, 292 Ga. App. 86, 89 (663 SE2d 793) (2008). Given our consistent recognition of this principle, we are not convinced that affirmative and individualized evidence always is required to authorize a finding that a child has a need for permanence and stability.

*In the Interest of C. L.* is on point with our case today. Nonetheless, as set forth above, we need not reach this issue because the mother failed to appeal the finding of abandonment, which is dispositive.

[2] The majority's remand of this case "for the juvenile court to clarify its findings such that they can be meaningfully challenged and reviewed on appeal" is a waste of judicial resources when the current order specifically states that the

juvenile court "finds that the child has been abandoned by [the mother] pursuant to [OCGA] § 15-11-2 and [OCGA] § 15-11-310." And additionally enumerated the following specific factual findings:

> 27. The mother has failed to develop and maintain a parental bond with the child in a meaningful, supportive manner for a period in excess of six months prior to the hearing on the petition for termination of parental rights.
>
> 28. The mother has without justifiable cause failed to provide for the care and support of the child as required by law for a period in excess of six months prior to the hearing on the petition for termination of parental rights[; and]
>
> 29. The mother has without justifiable cause failed to comply with a court ordered plan designed to reunite the child with the mother for a period in excess of six months prior to the hearing on the petition for termination of parental rights.

In addition to these three numbered findings, the juvenile court also found:

> [t]he mother declined supervised visitation with the child for several months beginning in May 2015. The mother has seen the child once in the last eight (8) months, in March 2016. The Department offered supervised visitation with the mother and the child at the Department's office, which the mother declined. The mother testified that she sought to re-engage visitation in January 2016, but was unable to visit until March 8, 2016[,] because the offered location at the Department's office

3

judgment of the trial court[3] and only leaves for this Court the issue of whether the juvenile court properly determined that the State presented clear and convincing evidence that termination is in the best interests of the child pursuant to OCGA § 15-11-310 (b). As set forth in the majority and Presiding Judge Barnes's dissent, there is no question that the State met this burden. Therefore, this Court should affirm the juvenile court's order terminating the mother's parental rights.

I am authorized to state that Presiding Judge Ellington and Judge Andrews join in this dissent.

---

was inconvenient. Once the visits changed location to the courthouse, the mother did visit one (1) time with the child.

These findings contain all the necessary factual findings to support the trial court's explicit termination on the alternative ground of abandonment, and as aptly stated by Presiding Judge McFadden in his dissent, "we should not drag out this litigation for another year so he can present us with a more perfect order."

[3] See, e.g., *In the Interest of E. G. M.*, 341 Ga. App. 33, 49 (2) (a) (798 SE2d 639) (2017); *In the Interest of B. M. L.*, 239 Ga. App. 511, 512 (521 SE2d 448) (1999). Cf. *Marks v. State*, 280 Ga. 70, 75 (4) (623 SE2d 504) (2005) (holding that failure to enumerate on appeal a ruling as error will result in waiver of the claim); *Hewitt v. Community & Southern Bank*, 324 Ga. App. 713, 716 (2) (751 SE2d 513) (2013) ("Grounds that are not attacked as erroneous will not be considered on appeal and are presumed to be binding and correct. An appellant's failure to attack alternative bases for a judgment results in the affirmance of that judgment.").

4

A17A1595. IN THE INTEREST OF R. S. T., a child.

MCFADDEN, Presiding Judge, dissenting.

This is not a close case. The trial court's detailed findings of fact fully support his alternative conclusions that this child faces a prospect of serious harm and that she has been abandoned. I do agree that it would have been better, and more helpful to this court, if the juvenile court had more clearly connected up his findings of fact with his conclusions of law and with the statutory text. But we should not drag out this litigation for another year so he can present us with a more perfect order.

If this were a close case, the very serious issues Chief Judge Dillard raises in his concurring opinion would be salient. But this is not a case like *In Interest of E. M. D.*, 339 Ga. App. 189 (793 SE2d 489) (2016), where "the mother and child[] are bonded and emotionally close[.]" Id. at 205 (2) (b) (citation and punctuation omitted). Rather it is one where the evidence amply "support[s] a finding that the parent's relationship with the child, or lack thereof, is such that maintaining the status quo of foster care with a continued parental relationship would . . . be harmful." Id. at 202 (2) (b).

So I join in the judgment and most of the analysis of Presiding Judge Barnes's dissent. I write separately to point out a distinction incidental to our analysis today but important in other cases.

I do not agree that the mother has failed to enumerate as error the juvenile court's finding of abandonment. "An error of law has as its basis a specific ruling made by the trial court."*Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999). "The individual facets of appellants' attack on the legal ruling with which they took issue are arguments in support of a legal position and are not, in and of themselves, errors of law." Id.

> Where it is apparent from the notice of appeal, the record, the enumeration of errors, or any combination of the foregoing, what judgment or judgments were appealed from or what errors are sought to be asserted upon appeal, the appeal shall be considered in accordance therewith notwithstanding . . . that the enumeration of errors fails to enumerate clearly the errors sought to be reviewed.

OCGA § 5-6-48 (f). Here the mother has made it very clear that she is appealing from the termination of her parental rights.

Of course her appellate brief does not address the juvenile court's finding of abandonment. "With rare exceptions, this Court, like all appellate courts, should decide the issues presented by the parties, as the parties present them." *Turner v. Flournoy*, 277 Ga. 683, 686 (2) (594 SE2d 359) (2004). But I agree with the majority that this case is one of the exceptions.

2